IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BURKHOLDER V. BURKHOLDER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JASON L. BURKHOLDER, APPELLANT AND CROSS-APPELLEE,

V.

HEATHER E. CARROLL, FORMERLY KNOWN AS HEATHER E. BURKHOLDER,
APPELLEE AND CROSS-APPELLANT.

Filed May 31, 2016.    No. A-14-666.

Appeal from the District Court for Phelps County: STEPHEN R. ILLINGWORTH, Judge. Affirmed as modified.

Chris A. Johnson and Joshua A. Johnson, of Conway, Pauley & Johnson, P.C., for appellant.

Jane F. Langan Mach and Jesse S. Krause, of Rembolt Ludtke, L.L.P., for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Jason L. Burkholder appeals, and Heather E. Carroll (formerly known as Heather E. Burkholder) cross-appeals, from the decree dissolving their short-term marriage entered by the district court for Phelps County. At the time the decree was entered, Jason was 39 years old and Heather was 38. The parties were awarded joint legal custody of their twins (age 5 at the time the decree was entered), and primary physical custody was awarded to Heather. The errors alleged between the two parties pertain to custody, parenting time, child support, child support credit, daycare costs, denial of a motion to recuse, and evidentiary challenges, including challenges to a psychologist's child custody evaluation and testimony.

- 1 -

After consideration of the numerous volumes of testimony and evidence, and the arguments of the parties, we are unable to say the district court abused its discretion on most matters raised, and we affirm the district court's decree of dissolution with only slight modifications related to Jason's child support credit and the children's birthday.

## II. PROCEDURAL BACKGROUND

Jason and Heather were married in March 2008 and separated by August 2011. They met online and lived in South Dakota from October to December 2007, at which time they moved to Loomis, Nebraska. Shortly before the July 2008 birth of their twins, Madisen and Taylor, they moved to Holdrege, Nebraska. Jason also had a teenage daughter, Jaleigh, from a prior relationship; her mother had custody.

Jason and Heather were in the Air Force Reserves, and in 2008, they both transferred to the Nebraska Air National Guard (Guard). In addition to Guard duties, Jason worked in construction and at his family's farm; most recently he was self-employed doing construction work. Jason left the Guard during the marriage. Other than Guard duties, Heather did not work for 18 months after the twins were born, but then worked as a certified nursing assistant at Christian Homes in Holdrege, an assisted living home for the elderly, until she moved to Lincoln, Nebraska, in August 2011.

A number of hearings on various motions occurred throughout the proceedings which commenced in August 2011; trial took place over the course of four days in March, September and November 2013. The divorce decree was entered in February 2014. We recount now the procedural aspects of the case which began with Heather filing for a domestic abuse protection order in August 2011.

### 1. EX PARTE DOMESTIC ABUSE PROTECTION ORDER

In August 2011, Heather was on military active duty orders for 30 days, working in Lincoln. She traveled to Lincoln early on Monday mornings, worked 10- to 12-hour days, "came home as early as possible on Thursdays," and spent Friday and the weekend "with the family." According to her trial testimony, she and Jason were packing for their drill weekend on July 31, 2011 (this was challenged by Jason because he had been discharged from the Guard in May 2011), and she had pressed the wrong uniform for him, and "it got thrown across the kitchen" (presumably by Jason); ceramics fell and shattered. There "was a lot of hollering and yelling and name calling . . . it was horrible." The children awoke from their nap and came downstairs. Jason left and then came back and took the children to his parents. This left Heather without a car; however, Jason's father showed up and provided her another vehicle so she could make her drill weekend. After talking to her commander about the incident, Heather went to Voices of Hope, "a home for battered women," where she "made plans to execute [her] safe exit strategy," and she filled out "the ex parte request."

Exhibit 48 shows that on August 4, 2011, Heather filed a "Petition and Affidavit to Obtain Domestic Abuse Protection Order." Heather's allegations in support of her request for a protection order included two incidents alleged to have occurred in June 2011. One took place in Lincoln at LaQuinta Inn, when Jason was upset "regarding discipline for Madis[e]n," and yelled and called

Heather names in front of the children. Jason "tore the keys" out of Heather's hand when she was trying to leave and take the children away from Jason's behavior. Another incident occurred in Lincoln when "[t]he family was staying at Country Inn & Suites for Jason's brother's wedding reception." Jason threw food at Heather in front of the children while they were at breakfast, then threw her belongings out of the hotel room and pushed her out of the room. Heather rode back to Holdrege with Jason's parents. There is also an undated reference to "many occasions" when Jason "tried to kick [her] out of [her] home," locked her out of the house, had taken her keys, phone, and vehicle, and thrown items at her in front of the children. Heather's testimony about some of these incidents are discussed in more detail later in this opinion. The protection order petition does not contain any specific reference to the July 31, 2011, incident described above which her trial testimony seemed to suggest precipitated her filing for a protection order. After obtaining an ex parte domestic abuse protection order (which granted Heather temporary custody of the children) on August 4, Heather left the marital home with the children and moved to Lincoln on August 8. The next day, August 9, Jason filed a complaint for dissolution of marriage and a motion for "temporaries." Heather filed an answer and counterclaim on September 7, which included a request for temporary custody, child support, and alimony.

### 2. TEMPORARY ORDER AND DISMISSAL OF PROTECTION ORDER

On September 26, 2011, a temporary order was entered. In addition to directives regarding the development of a parenting plan, mediation, and parenting education, the court awarded temporary legal and physical custody of the children to Heather, and a temporary parenting schedule provided Jason with "[t]wo weekends per month," from Friday at 5:30 p.m. to Sunday at 5:30 p.m., unless the parties otherwise agreed. A holiday parenting schedule was also provided, and the exchange of the children was to take place at an agreed upon location at the Aurora, Nebraska, I-80 interchange. Jason was ordered to pay temporary child support of $836 per month commencing October 1, 2011; the amount was based on monthly income of $3,500 for Jason and $2,400 for Heather, no retirement deductions, and a $142 health insurance premium deduction for Heather. The court denied Heather's request for temporary alimony. Heather was ordered to continue to provide health insurance for Jason and the children. She was ordered to pay the first $480 of uncovered medical costs per child; thereafter, Jason was to pay 53 percent and Heather 47 percent of such uncovered costs. Each party was ordered to pay one-half the daycare costs necessitated by Heather's employment. Jason was ordered to pay $2,000 in temporary attorney fees to the district court clerk for Heather's benefit. Both parties were also "restrained from harassing or disturbing the peace of each other."

The domestic abuse protection order was dismissed by court order on September 26, 2011; the order indicated the relief requested and granted ex parte should be dismissed because it "does not qualify under Neb. Rev. Stat. [§] 42-903 [Reissue 2008] and furthermore would hinder visitation" in the dissolution case. The order further noted that a reciprocal restraining order had been entered in the dissolution case.

### 3. MOTIONS FOR PSYCHOLOGICAL TESTING

On October 12, 2011, Heather filed a "Motion for Psychological Testing," asking the court to require Jason to participate in a psychological evaluation by Dr. John Meidlinger, a certified clinical psychologist, to determine Jason's psychological condition and its effect on his parenting skills. On October 14, Jason also filed a "Motion for Psychological Testing," asking the court to require Heather to participate in a psychological evaluation by Dr. Meidlinger because the "mental condition and status of [Heather] is material and relevant evidence as to the best interests of the parties' minor children." Jason further requested that the court order

> a psychological family assessment of the parties and the minor children in this matter to address the issues of custody, health and welfare of the children, the fitness of each party to parent the minor children, and to make a recommendation with regard to the physical custody of the minor children, visitation and related recommendations affecting the best interests of the minor children.

### 4. ORDER FOR FAMILY ASSESSMENT BY DR. MEIDLINGER

On February 13, 2012, in addition to addressing a tax dependency exemption issue raised by the parties, the district court ordered a psychological family assessment of the parties and the children with Dr. Meidlinger. The court ordered, "Dr. Meidlinger shall make recommendations to the Court as to legal and physical custody of the minor children and also to visitation."

### 5. MOTIONS REGARDING TEMPORARY CHILD SUPPORT AND PARENTING TIME

On April 11, 2012, Jason filed a motion to reduce his temporary child support obligation because the amount ordered "was not calculated based on the parties['] present income or the income amounts submitted to the Court at the time of Temporary Hearing." Two days later, on April 13, Heather filed a motion to strike Jason's motion to reduce temporary child support since he did "not allege that there has been a material change in circumstances warranting modification of the Court's Temporary Child Support Order." Alternatively, Heather argued that Jason should be required to make his motion to reduce child support (and apparently another motion regarding parenting time not in our record) "more definite and certain."

On April 24, 2012, Jason filed an "Amended Motion to Reduce Temporary Child Support" which added that "evidence now confirms that the parties' income each and every month was not utilized in the present child support calculation, that [Heather's] income is substantially more and expected to last at least six months." Additionally on April 24, Jason filed an "Amended Motion for Clarification & Modification" which sought clarification of alleged contradictory language in the temporary order regarding his weekend parenting time. On May 10, the district court overruled Jason's request to recalculate child support because "it is the policy of the District Judges in the Tenth Judicial District that Temporary Orders are not reviewed and revised because if that were the policy most temporary orders would have reviews." The court did clarify the parenting schedule to mean alternating weekends for Jason (rather than two weekends per month).

### 6. Jason's New Attorney and Motion to Exclude Dr. Meidlinger's Testimony

Jason's initial attorney filed to withdraw as counsel on August 30, 2012; new counsel entered an appearance on September 6.

On October 1, 2012, Heather filed a "Motion for Order to Show Cause" alleging Jason failed to pay his share of daycare expenses.

On November 26, 2012, Jason filed a "Motion to Exclude/Schafersman Challenge" seeking to exclude the testimony of Dr. Meidlinger; an amended motion was filed the next day. Jason sought to exclude testimony from Dr. Meidlinger based upon Dr. Meidlinger's custody evaluation not meeting "the requirements of expert testimony as has been spelled out in *Daubert v. Merrell Dow Pharmaceuticals*, [*Inc.*,] 509 U.S. 579[, 113 S. Ct. 2786, 125 L. Ed. 2d 469] (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137[, 119 S. Ct. 1167, 143 L. Ed. 2d 238] (1999); and *Schafersman v. Agland Coop*, 262 Neb. 215[, 631 N.W.2d 862] (2001)." Heather filed an objection to this motion on December 3. She argued the motion should be dismissed because Jason specifically requested an evaluation by Dr. Meidlinger and therefore to the extent "any error was committed by the Court in appointing Dr. John Meidlinger to conduct a custodial evaluation, such error was invited by [Jason] and consequently [Jason] is barred from seeking the relief set forth" in his motion.

In addition to addressing various pretrial matters, a journal entry was entered on December 31, 2012, scheduling the case for trial at the end of January 2013. Also on December 31, 2012, Jason filed an objection to Heather's witness list which contained 28 witnesses; Jason asked that the list be pared down, or alternatively, that trial be continued.

### 7. Motions and Order on Daycare, Additional Exhibits, and Continuing Trial

On January 22, 2013, Jason filed an "Objection to Change of Daycare." Jason represented that Heather's initial daycare cost of $800 per month had increased to $1,080 per month when she changed to a second daycare provider, and then increased again to $1,292 per month when she changed to a third provider (Cedars). Jason stated he did not have sufficient income to cover the increased costs, and further, Heather was "in fact making over $3,000 per month," not the $8 per hour she reported at the time of the temporary order. Jason sought an order limiting his share of such costs to 50 percent of the original daycare costs or eliminating his share entirely.

On January 23, 2013, the district court entered an order continuing trial to March, and in response to a motion filed by Heather, permitted her to offer additional exhibits to oppose Jason's motion to exclude Dr. Meidlinger's report and testimony.

On February 2, 2013, Jason filed a motion to add exhibits and amend his final witness list.

### 8. Order Regarding Dr. Meidlinger's Testimony and Other Pending Matters

The district court entered an order February 19, 2013, on several matters pending before it. As to Heather's pending show cause on daycare, the court concluded Jason was not in contempt because Heather did not timely provide copies of daycare bills. The court determined that Jason owed Heather $2,402.50 for daycare costs, and allowed him to pay this judgment at $100 per month commencing March 1, 2013, for 23 months, with a final payment of $102.20; Heather's request for attorney fees was overruled. The court also overruled Jason's objection to daycare

changes and costs "because he failed to prove there was any substantial increase in cost over the present daycare or that this daycare provider was inferior."

As to Jason's motion to exclude Dr. Meidlinger's testimony, the district court's February 19, 2013, order noted that Dr. Meidlinger's report and recommendation was sent to the attorneys on July 7, 2012, and that Dr. Meidlinger recommended that Heather be awarded primary legal and physical custody. The district court indicated that Dr. Meidlinger was competent in his field but reserved for trial any ruling on whether Dr. Meidlinger would be permitted to give an opinion on custody.

### 9. MOTION TO STRIKE AND MOTION IN LIMINE

On February 26, 2013, Heather filed a motion to strike/objection to Jason's supplement of his amended final list of witnesses and exhibits.

On February 28, 2013, Jason filed a motion in limine to restrict Heather from eliciting any evidence or reference to Jason's criminal records (a 2005 third degree assault case from Phelps County District Court and a 1995 third degree assault case from Buffalo County District Court) because Jason's "plea of no contest was accepted in these cases and the use of such convictions in later civil proceedings is prohibited." The district court did not allow this evidence at trial.

Jason further sought an order prohibiting Dr. Meidlinger from testifying with respect to any part of his administration of the MMPI-II, or any interpretation thereof, "for the reason that the [MMPI-II] is not designed for use in custody evaluations and there exists no standard for extrapolating information from a test administered for a purpose that it is not designed for, and then using that improperly extrapolated information for another purpose." Dr. Meidlinger was permitted to testify regarding the MMPI-II.

### 10. MARCH 2013 MOTIONS FOLLOWING FIRST 2 DAYS OF TRIAL

The first two days of trial took place March 12 and 13, 2013. Trial evidence from these two days will be discussed in the analysis section when relevant to the issues raised on appeal.

On March 15, 2013, Jason filed a motion to strike Dr. Meidlinger's testimony with respect to his custody evaluation "for the reason that under Nebraska Rules of Evidence §702, Dr. Meidlinger has failed to meet the *Daubert*/*Schafersman* standards concerning admissibility of evidence."

On March 22, 2013, Heather filed an objection to the issuance of a subpoena duces tecum on Dr. Meidlinger because, among other reasons, the discovery deadline had passed. The matter was heard May 29, and an order was entered June 12 sustaining the objection for that reason.

### 11. JASON'S MOTION TO RECUSE AND HEATHER'S MOTION TO MODIFY TEMPORARY ORDER

On August 6, 2013, Jason filed a motion to recuse the district court judge. His basis for this motion is discussed in our analysis of his assigned error regarding the denial of this motion.

On August 8, 2013, Heather filed a motion to modify the September 26, 2011, temporary order. She sought to modify the location where the parties exchanged the children. She stated that Jason's actions at the exchanges caused her "to fear for her safety," and Jason's "confrontational

nature during the visitations is contrary to the childrens' [sic] best interests." Heather asked that the exchanges take place at the Aurora police department.

## 12. ORDER ON PENDING MOTIONS

On September 5, 2013, the court took up two motions filed by Jason: the renewal of his motion to strike Dr. Meidlinger's testimony and a motion to recuse the trial judge. On September 13, the court entered an order addressing these two motions, as well as Heather's motion to modify the temporary order regarding the location for exchanging the children. The court overruled the motion to strike without further comment, and in overruling the motion to recuse, the court stated, "The Court does not have a personal bias or prejudice concerning [Jason]. [Jason's] request is based on the fact he disagrees with the Court's ruling on an evidentiary issue. That is not a sufficient basis for recusal." The court modified the temporary order, stating, "The parties shall exchange the minor children in alternating weekend visitations in Grand Island and Aurora, Nebraska[,] at the Police Station in each community." A request by Heather for attorney fees was overruled.

## 13. TRIAL RESUMES

Trial resumed for a third day on September 25, 2013, and its fourth and final day took place on November 19. Trial evidence from these two days will be discussed in the analysis section when relevant to the issues raised on appeal.

## 14. DECREE OF DISSOLUTION

On February 21, 2014, a decree of dissolution was entered. In pertinent part, it ordered as follows.

### (a) Custody

The parties were awarded joint legal custody of their children with primary physical custody awarded to Heather. In discussing its custody decision, the court found both parents to be fit and of good character. The court discussed Jason's challenge to Dr. Meidlinger's custody evaluation and recommendation, stating:

> As is clear under Nebraska Law the Court must make a determination of it's [sic] own and Dr. Meidlinger's opinion is only one factor in that determination. Dr. Meidlinger's main concern was about the father's obvious anger issues and his extended failures to support relationships with the mother. Dr. Meidlinger's opinion is only a small part of the reason the Court is awarding custody to the mother.

The district court reasoned that "because of the father's anger issues as evidenced by prior assault issues, his behavior at visitation exchanges and past aggressive behavior toward his wife that the mother can better provide for the emotional growth of the children. This factor favors placement with the mother."

The court then discussed additional factors. It considered health and stability, and found that both parents could promote the physical health of the children, but it concluded Heather could better promote the mental health of the children for the reasons previously noted. In considering

Jason's argument that the stability factor favors him because of his family support in Holdrege and because Heather could be deployed by the military, the court concluded that "uncertain possibility of deployment does not mean she cannot be the custodial parent and provide stability." The court found both parents capable of providing stability, so this factor favored neither party. Likewise, the court found that both parties were capable of providing for the physical care of the children and both would provide for regular school attendance.

As to the general health and welfare of the children, the district court was "concerned that if the father continues to display his anger issues this would be the role model for future social behavior of the children. This factor favors the mother."

The court found that both parents could provide good environments for the children with regard to housing, but that Jason's family support group was a factor that favored Jason.

In considering the emotional relationship between the children and parents, the court found that this factor favored Heather. The court stated, "The father has anger issues that he has not adequately addressed." The court noted the testimony of one witness who observed a visitation exchange and it "was very revealing about which parent has the most solid emotional relationship with the children," and that "the children were basically afraid of [Jason] and were looking to their mother for comfort during the visitation exchange." The court also found that Heather had demonstrated "over the last two and a half years that she can maintain a stable environment for the children. She has done a good job of parenting. The Court does not want to disrupt a relationship that is working."

In summarizing why it was in the children's best interests for Heather to have primary physical custody, the court stated:

> She has had primary physical custody of the children since August 2011 and they are doing well. The father has anger issues. The Court is convinced that there was at the very minimum emotional and mental abuse by the father against the mother during the marriage. The Court concludes this by observations in Court of the mother and Amy Parker, the mother of [Jason's] other child. When both testified, both witnesses were visibly upset when discussing [Jason's] treatment of them. Clearly both have fear of [Jason]. The Court also heard testimony from Daniel Adams whom [sic] observed a visitation exchange between the parties. He testified that during the exchange the boy was grabbing Mom's leg and the daughter was grabbing Mom and veering away. There also was evidence of other incidents in Lincoln, Nebraska, Minnesota and Holdrege where father's anger issues escalated into bad situations. The mother in this case is in better control of her emotions and will provide a better role model for the children in terms of controlling their emotions. As previously noted a factor the Court can consider in determining custody under § 43-2923(6)(d) is credible evidence of abuse inflicted on any family member or household member. The Court determines there was credible evidence of abuse by [Jason] on [Heather] during the marriage. The Court therefore concludes the mother has better control of her emotions which translates to better parenting.

### (b) Parenting Time

Jason was awarded alternating weekend parenting time commencing on Friday at 5:30 p.m. and concluding on Sunday at 5:30 p.m. Also, to the extent that the children have extra, non-holiday weekdays off from school that occur in conjunction with a weekend, such days "shall be added to the weekend of the party who has the children for that particular weekend." Jason was awarded 8 consecutive weeks of summer parenting time each year, with Heather exercising "the same every other weekend parenting time enjoyed by [Jason] throughout the year." Jason was given an "automatic 50% reduction in child support" during June and July "for the eight weeks he exercises summer parenting time." This abatement is to be automatic unless Heather produces an affidavit stating the parenting time did not occur, and then a hearing would be scheduled. If a parent is hospitalized or travels out of town overnight without the children, the "children shall be with the other parent." An alternating holiday schedule was included in the parenting plan. Parenting time exchanges were ordered to take place in Aurora at the commencement of parenting time, and in Grand Island at the conclusion of parenting time.

### (c) Child Support Credit

The district court concluded that Heather's income was "indeed . . . substantially higher than set out in her temporary affidavits within three (3) months after separation." The court found that "it does appear to the Court that [Jason's] Child Support had been set too high at least since May 12, 2012[,] when the Court overruled that last motion to reduce." The court accepted Heather's proposed child support calculation showing Jason should pay $529 per month (effective March 1, 2014), and concluded that Jason

> should receive a credit from June 1, 2012[,] through February 1, 2014[,] of the difference of his [o]rdered support of $836.00 less $529.00. That is a credit of $307 per month times twenty one (21) months or a credit of $6,447.00. The Court will therefore [o]rder [Jason] to pay child support of $529.00 less $200.00 per month credit on his child support obligation. The credit will be extinguished in thirty two point twenty four (32.24) months and then the child support shall go back to $529.00. The Court has never made this type of adjustment but equity in this case convinces the Court that since there was such a great disparity in what was [o]rdered and what should have been [o]rdered, a credit is merited.

The worksheet attached to the decree shows income of $5,960 per month attributed to Heather, and $3,200 to Jason.

### (d) Daycare Costs

Work-related daycare was to be paid 30 percent by Jason and 70 percent by Heather. The court denied Jason's request to recalculate the temporary order on daycare.

### (e) Health Insurance

Heather was ordered to maintain health insurance on the children, and to pay the first $480 of unreimbursed medical expenses for each child, with the remaining uncovered costs split 30

percent by Jason, 70 percent by Heather. Heather was also ordered to maintain Jason on her health insurance policy for 6 months after the filing of the decree.

## 15. MOTIONS FILED POST-DECREE

On February 28, 2014, Jason filed a motion for new trial, or alternatively, to alter or amend the decree because: the decision was not sustained by sufficient evidence; there was newly discovered evidence related to free daycare for the children of active duty military; the child support calculation failed to include Heather's military basic subsistence and housing allowances and her VA disability benefit (additional $1,494); Jason's 2012 tax return was not offered/received into evidence and was necessary to correctly calculate Jason's income; daycare costs previously ordered needed to be corrected; and the decree failed to include that Heather shall have 15 days to pay her share of Jason's daycare costs.

On March 3, 2014, Heather also filed a motion for new trial, or alternatively, to alter or amend the decree because: the decree failed to state that the decree was not final for 6 months after the decree is entered for the purpose of continuation of health insurance coverage, and the decree needed to clarify that Heather was required to maintain Jason's health insurance so long as allowed by her employer; Heather was "prevented from having a fair trial in that the Court ordered each party to pay one half of costs," and that the court needed to define taxable costs and allocate them "based upon the party incurring the costs"; the court failed to take into account the changes in Heather's income when calculating Jason's child support credit; and the decision was not sustained by sufficient evidence and was contrary to law.

## 16. POST-DECREE ORDER

After hearing both parties' arguments pertinent to their post-decree motions, the court overruled the motions filed by both parties in its June 23, 2014, order. However, the court did amend the decree (1) to address finality of the decree with regard to continuation of health insurance, (2) to provide that the parties are to alternate Spring Break, and (3) to provide that each party was to pay their own costs.

Jason timely appealed to this court on July 22, 2014; Heather cross-appealed.

## III. ASSIGNMENTS OF ERROR

Restated, Jason assigns that the district court erred by: (1) receiving Dr. Meidlinger's report and testimony and failing to sustain Jason's *Schafersman* challenge to exclude such evidence; (2) making certain evidentiary rulings contrary to the rules of evidence; (3) not awarding Jason physical custody of the children; (4) incorrectly determining Jason's daycare obligation; (5) using Jason's earning capacity to establish child support; (6) not correcting a child support error in a temporary order; and (7) not sustaining the motion to recuse.

Heather cross-appeals and assigns that the district court erred by: (1) failing to award her sole legal custody; (2) awarding Jason eight consecutive weeks of parenting time and failing to address the children's birthday; (3) failing to prorate the cost of health insurance between the parties in calculating child support; and (4) failing to take into account the changes in Heather's income from October 2012 to September 2013 when it awarded Jason a child support credit.

- 10 -

## IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, the division of property, alimony, and attorney fees. *Id.*

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion. *Gallner v. Larson*, 291 Neb. 205, 865 N.W.2d 95 (2015).

A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

## V. ANALYSIS

### 1. JASON'S APPEAL

#### (a) Dr. Meidlinger's Testimony and Report

##### *(i) Dr. Meidlinger's Selection, Report, and Deposition*

As noted in the background section above, in October 2011, both parties filed motions for a psychological evaluation of the other party, and both specifically requested Dr. Meidlinger. Jason also requested that the court order "a psychological family assessment of the parties and the minor children in this matter to address the issues of custody, health and welfare of the children, the fitness of each party to parent the minor children, and to make a recommendation with regard to the physical custody of the minor children." The district court responded to these requests by entering an order on February 13, 2012, directing a psychological family assessment of the parties and the children with Dr. Meidlinger. The court stated, "Dr. Meidlinger shall make recommendations to the Court as to legal and physical custody of the minor children and also to visitation."

Dr. Meidlinger sent a letter to the parties' attorneys on July 27, 2012 (Exhibit 32), which summarized his evaluation of the parties and their children. The report indicated that: clinical interviews were conducted with each parent; observations were made of the children with each parent; the Minnesota Multiphasic Personality Inventory-II (MMPI-II) test was given to each parent; materials provided by both parties were reviewed; and telephone interviews were conducted with references provided by the parties and their attorneys. The report provided a list of

the written materials reviewed, background information about the parties, a summary of Dr. Meidlinger's evaluation of Heather and Jason, a summary of the MMPI-II testing, a summary of Dr. Meidlinger's observations of the parties with their children, a "discussion" of Dr. Meidlinger's concerns, and then a recommendation that Heather be awarded legal and physical custody.

On November 12, 2012, a couple of months after Jason's initial attorney withdrew and new counsel entered an appearance, Dr. Meidlinger's deposition was taken. In that deposition (Exhibit 24), Dr. Meidlinger testified to the following. He has been licensed to practice psychology in Nebraska since 1985, and his primary practice was in Grand Island. He estimated completing approximately one custody evaluation a month, or about 338 since 1983. He has also testified as an expert witness in court proceedings on average once or twice per month, mostly related to parenting issues in custody evaluations, psychological evaluations, and parental fitness matters. Dr. Meidlinger follows the American Psychological Association's (APA) guidelines for conducting custody evaluations. He noted that those guidelines recommend multiple sources of information and to focus on the best interests of the child. He discussed the MMPI-II, a self-administered test from which a profile is developed "to compare them with other persons who have been evaluated, and characteristics of persons with similar profiles." Dr. Meidlinger stated the test is widely accepted by clinical psychologists and has been used since the 1950s; he did acknowledge that the test has been subject to criticism, but that "[n]othing's perfect," and "it is heavily validated, and I think it gives useful information in regard to qualities important in parenting a child."

Dr. Meidlinger also met with Jason and Heather individually for 1½ hours each on two occasions (a total of 3 hours with each parent), then observed each parent for one hour with the minor children; he confirmed that such clinical interviews have been a standardized psychology technique used in custodial evaluations "[s]ince the beginning." Observing the parent with the children is also a standardized clinical psychology technique used for custodial evaluations and has been used "[a]s far back as people have been writing about custody evaluations. The 50's, I guess." He explained that the methodology he used to conduct a custodial evaluation in this case included: clinical interviews with each parent, observations with each parent and the minor children, review of psychological testing (MMPI-II), and information gathered from collateral sources, including telephone conversations and review of documents provided by the parties and their attorneys. He stated that it was typical for other clinical psychologists to use the same methods in conducting custodial evaluations because it is the standard with the APA, and it is a method used at continuing education workshops.

The specific areas considered by Dr. Meidlinger when making a custody recommendation include: "[f]itness of the parents, a good fit between parent's ability and the needs of the child, environmental circumstances." Dr. Meidlinger had never submitted an evaluation for peer review, but stated that the primary means of obtaining information he used was set forth in research articles, and "[i]n that sense, they're peer reviewed."

Dr. Meidlinger expressed that he was initially impressed with Jason's argument for custody "[b]ecause I think there is something to be said for keeping children in a community with extended family and roots and that I'm accustomed to thinking that people who are involved in farming are more likely to stay put and that would provide some continuity and consistency to the children to

remain with him." Dr. Meidlinger then noted, however, that Jason was in a relationship with a woman in North Platte who has four children, so "he might move there with her," and that as a self-employed carpenter (rather than farmer), Jason is "less tied to the community." Additionally, Dr. Meidlinger discussed information he considered pertaining to anger issues associated with Jason, and he later stated,

> The more that I looked at things, the more I felt that [Jason] has problems with anger and an inability to accept responsibility for his own role in problem relationships and that the problem – roots of the problem go back to the family he comes from and that all those factors would negatively impair the children if they were to grow up in that environment.

### (ii) Jason's Schafersman Challenge

On November 26, 2012, Jason filed his motion to exclude the testimony of Dr. Meidlinger based upon the custody evaluation not meeting "the requirements of expert testimony as has been spelled out in *Daubert v. Merrell Dow Pharmaceuticals*, [*Inc.*,] 509 U.S. 579[, 113 S. Ct. 2786, 125 L. Ed. 2d 469] (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137[, 119 S. Ct. 1167, 143 L. Ed. 2d 238] (1999); and *Schafersman v. Agland Coop*, 262 Neb. 215[, 631 N.W.2d 862] (2001)." Jason challenged Dr. Meidlinger's competency because "Dr. Meidlinger admitted that guidelines for custody evaluations that have been subjected to peer review analysis and publication exist but that he ignored them," and that Dr. Meidlinger "has no training with respect to the rules of evidence and factors a Court may consider." Jason further claimed that "[w]ith respect to training specific to custody evaluations," Dr. Meidlinger "failed to produce the syllabus" for a recent seminar he attended. Jason also claimed that Dr. Meidlinger followed the "APA Guidelines," even though he admitted the guidelines were "merely aspirational . . . and in fact are not guidelines at all." And although Dr. Meidlinger "admitted being aware of standards for custody evaluations as put forth by the Association of Family and Conciliation Courts, as well as the guidelines expressed in the Journal of American Academy of Child and Adolescent Psychiatry," he "ignored them." Because of this, it was Jason's position that Dr. Meidlinger "did not follow standards for conducting child custody evaluations that include scientifically valid approaches." Jason claimed the

> APA Guidelines contain no standardized methodology for conducting custody evaluations at all . . . [they] are merely aspirational and contain no specific instructions as to what a psychologist conducting a custody evaluation should use with respect to standardized testing and contains no recommendations at all for any type of scientifically validated standardized testing or what a psychologist should consider as far as subjective information in a decision making process.

The only standardized instrument used by Dr. Meidlinger was the MMPI-II; Jason claimed certain standards "specifically exclude the use of the [MMPI-II] in custody evaluations as it does not produce reliable information for how the individual being tested will parent." Jason claimed that "[w]ithout producing a peer reviewed publication for the specific methodology the witness chose to employ, it cannot be established that the specific methodology chosen has any reliability attached to it and therefore has no relevance and is not helpful to the trier of fact." Finally, Jason

alleged that since Dr. Meidlinger was not able to identify any peer reviewed analysis that would indicate that the application of his chosen methodology had been subject to peer reviewed analysis, then

> [i]t stands to reason that as the methodology chosen by the witness cannot be validated by any peer reviewed publication, then similarly, there would not be any peer reviewed analysis that the specific application of the methodology [Dr. Meidlinger] came up with himself has been applied in a scientifically reliable manner.

Jason requested that Dr. Meidlinger's testimony be excluded since it did "not meet the standards for expert testimony set forth in *Daubert*, *Kumho*, and *Schafersman*."

Heather filed an objection, arguing the motion should be dismissed because Jason specifically requested an evaluation by Dr. Meidlinger and therefore to the extent "any error was committed by the Court in appointing Dr. John Meidlinger to conduct a custodial evaluation, such error was invited by [Jason] and consequently [Jason] is barred from seeking the relief set forth" in his motion.

### (iii) Hearing on Jason's Schafersman Challenge

At the December 4, 2012, hearing on Jason's motion to exclude Dr. Meidlinger's testimony, several exhibits were offered and received without objection: Dr. Meidlinger's deposition (Exhibit 24); American Academy of Child and Adolescent Psychiatry Summary Guidelines (AACAP Summary Guidelines) (Exhibit 25); AACAP Guidelines, full set (Exhibit 26); Association of Family and Conciliation Courts Model Standards of Practice for Child Custody Evaluation (AFCC Model Standards) (Exhibit 27); APA Guidelines for Child Custody Evaluations in Family Law Proceedings (APA Guidelines) (Exhibit 28); the parties' stipulation to submit to Dr. Meidlinger (Exhibit 29); and Jason's rebuttal affidavit (Exhibit 30).

The court stated at the hearing, in part:

> Well, I kind of have a problem here because Dr. Meidlinger is one of the few people I trust to make an evaluation and a recommendation. I've been doing this over 24 years, gone through a lot of people who make these – who do these evaluations, make recommendations. And he's one of the few whose opinion I trust.
>
> So if I sustain [Jason's attorney's] motion, I got nobody. Except set a precedent where I have nobody for future evaluations that I can rely on in this district.
>
> . . .
>
> But who do I go to if I can't have Meidlinger? It sets domestic relations practice in this district way back because it leaves us with no independent voice to make a recommendation.
>
> . . .
>
> Any evaluation by any expert out there is not science, it's an art. . . It's an art. It's not a science. You can't put one single expert in this country on that witness stand that could tell me that their recommendation of who should have custody is a science. It's an art.

Jason's response was that the expert's methodology "still has to be something that's been peer reviewed; something subjected to peer review analysis and publication." Further, he argued, "testimony that is going to be based on specialized knowledge has to pass the *Daubert* analysis . . . there are standards that are published that tell psychologists what they should do when they're doing a custody evaluation so they can get good information." Jason argued that Dr. Meidlinger's methodology "is something that he made up on his own."

The district court expressed concern about ruling on this issue, noting that it could

set back, change totally, totally change how we do domestic relations cases in this district . . .

Right now the cost of divorce is too high for people in central Nebraska. I've got people coming into court all the time now that four years ago would have been with a lawyer. Can't afford a lawyer. Middle-class people.

So, this has ramifications beyond this case. It will affect every case down the line in terms of the cost of litigation. And right now, it's too high. It's too high for people in central Nebraska. Unless they've got a deep pocket, it's hard to try a case.

. . . [M]y ruling on this will affect not only this case but cases in the future in this district.

*(iv) Order on* Schafersman *Challenge*

The district court entered an order on February 19, 2013, noting that Dr. Meidlinger recommended that Heather be awarded primary legal and physical custody. As to Jason's motion to exclude Dr. Meidlinger's recommendation and testimony, the district court concluded:

It is clear to the Court that Dr. Meidlinger is competent in his field and has provided many recommendations to the Court over the years. The Court has confidence in his opinions but has not always followed his recommendations. The Court will receive his testimony at trial in this case. Whether the Court allows him to give his opinion on custody will be decided after his [sic] counsel has provided his foundational testimony. Even if the Court does not allow his ultimate opinion into evidence, much of the information he gathered to form that opinion could be helpful to the Court in making a final decision. [Jason's attorney's] attempt to exclude Dr. Meidlinger's testimony disregards three principals [sic] that the Court must follow in deciding this case:"1) In a bench trial there is a presumption that the finder of fact disregards inadmissible evidence. 2) Many of the objections [Jason's] counsel makes about Dr. Meidlinger go to the "weight" the Court might give his opinion, if it is received in evidence. 3) Trial Judges may not abdicate their responsibility to make the final decision on custody. Dr. Meidlinger's opinion, if received, is only one piece of evidence that must be considered to determine custody."

The Court therefore will allow Dr. Meidlinger to testify, will rule on admissibility, of his opinion at trial, as to his opinion on custody and if the opinion is received state in the final decision whether the Court relied on that opinion.

At trial, Dr. Meidlinger testified as follows. He does "a lot of forensic work, psychological evaluations," and he supervises, consults and does "some psychotherapy." He has conducted approximately one child custody evaluation per month since 1983 and has testified as an expert witness "hundreds" of times in clinical psychology and "somewhere around 50 to a hundred times" in custody evaluations.

To conduct a custody evaluation, Dr. Meidlinger looks at four sources of information: (1) interviews with parents; (2) observations with the minor children; (3) psychological evaluation (MMPI-II); and (4) information from other sources, which includes telephone conversations with references provided by the parties and review of documents provided by the parties and attorneys. Dr. Meidlinger follows the APA Guidelines. He described these guidelines as ethical principles of psychologists, and that they indicate that "psychologists are expected to focus on the best needs of the child, to provide information in regard to the functioning of the parents and the interaction between the functions of the parents and the needs of the child, and that we take data from multiple sources."

Dr. Meidlinger met with Jason and Heather individually for 1½ hours each on two occasions (a total of 3 hours with each parent), then observed each parent for one hour with the minor children (who were 4 years old at the time). Each parent was also given the MMPI-II; Dr. Meidlinger agreed that when talking about "the MMPI," he is referring to the MMPI-II. Dr. Meidlinger chose to administer this particular test because "[i]t provides a rough screening for a severe psychopathology," and "it gives me information about the characteristics of the parents that are relevant in terms of their ability to parent." As he had indicated in his deposition, Dr. Meidlinger stated that the test has been used by clinical psychologists in custody evaluations since the 1950s. The test consists of approximately 566 questions and a profile is developed from the answers. Then the "profile is compared with characteristics of other persons which [sic] have very similar profiles." Dr. Meidlinger stated the "MMPI" provides useful information regarding qualities important in parenting a child because

> [p]arents can be affected by a number of psychological factors in terms of their ability to parent both short-term and long-term. Short-term factors might include severe anxiety, depression, thought disorder.
>
> Long-term would be dysfunctional patterns of developing relationships, ability to focus on the needs of the child. For example, ability to be calm and to be patient with the child and ability to understand and set up an appropriate environment for the child to grow in.

Dr. Meidlinger testified that the "MMPI" testing revealed, for both parents, evidence of psychopathology that would interfere with parenting.

Dr. Meidlinger also talked with the references given to him and he reviewed the materials provided. His written report was received over Jason's objection on grounds of hearsay and being cumulative.

Dr. Meidlinger further testified about Heather's challenging childhood and "problems getting involved with good relationships." He noted, however, that she had done well in terms of her career in the Air Force. "She is described as a good manager, an organized person in terms of getting things taken care of, and is described in positive terms by the people who have had extended periods of time to see her with her children." When asked what positive attributes support placing the children in Heather's custody, Dr. Meidlinger testified:

> She loves her children. She has organized her life around them. She believes it is important to support a relationship between her children and their father. She has good opportunities for a career both at present and in the future. And she is a bright, competent person.

When asked about concerns regarding Jason's ability to parent, Dr. Meidlinger testified about Jason's "anger and the ability of him and his extended family to support a relationship with [the children's] mother."

Dr. Meidlinger testified that there was not sufficient communication between the parties to justify joint legal custody, that this would "lead to more stress than resolution of problems." Dr. Meidlinger opined that primary legal and physical custody should be with Heather.

Jason challenged Dr. Meidlinger with regard to his telephone interviews, including whether he considered the biases of some of the witnesses. Dr. Meidlinger confirmed that he spent 1½ hours with each parent on two occasions, for a total of 3 hours with each parent. He acknowledged that the MMPI-II was not designed for use in custody evaluations, and he made it clear that he was "not making a recommendation for custody based on the MMPI." He disagreed with Jason's assertion that the MMPI-II "says nothing about how this individual may or may not parent his children." But he did acknowledge that "somebody should not be kept from being a parent because of how they score on a test or because of the diagnosis somebody gives them."

Dr. Meidlinger confirmed that his methodology for custody evaluations is to administer the MMPI-II, conduct clinical interviews with the parents, conduct clinical observations of both parents with the children, review documents provided to him, and conduct telephone interviews with collateral sources provided to him. Dr. Meidlinger did not know if his methodology or its application had been tested; he stated that his methodology and its application had not been subjected to peer review analysis or publication. Dr. Meidlinger testified that he now understood the standards a court considers for determining the best interests of children, and that his custody evaluation encompassed those standards. He testified:

> What I look at when I do a custody evaluation is whether the pieces of information that I have come into some kind of coherent picture that makes sense to me, that is supported to some extent by testing, by what I hear in the interviews, by what I see in the observations, and what I get from reviewing documents.
>
> If at the end of it, I can say all these things fit together and I see how and they make sense to me, I believe that I've proved beyond just the subjective nature of and the biases of people. And in this case it seems to me it's pretty simple.
>
> . . . .

[Heather] had an authoritarian father and a passive mother. And [Jason] had an authoritarian father and a passive mother. And she spent the relationship trying to tell him she wasn't going to put up with that. He spent the relationship teaching her that she needed to learn how to do that. That's a lack of insight that they both have, and they went around and around that circle.

The difference between them is, I believe, that Jason is capable of violence, and I think that would be traumatic for these children.

. . . .

I believe he's a very good father, but I believe there are two sides to him. And placing custody with Mother allows her to be generous with time with him as I believe she has been. But it also gives her a resource to pull that back if he becomes abusive or traumatizing to their children.

Dr. Meidlinger testified that it is typical for other clinical psychologists to use the same methods he used in conducting a custodial evaluation. Under questioning from Heather, Dr. Meidlinger responded that his methodology had been peer reviewed, stating, "These were incorporated in the standards of the [APA] because they reflect best practice. It's what people are doing. These are the sources of information that we have available to us about [sic] making decisions about custody."

Jason asked about information contained in Dr. Meidlinger's report, and Dr. Meidlinger confirmed his reported observation that Jason was more at ease with the children and Heather was more stiff and uncertain as to what to do. Also, Dr. Meidlinger testified that Heather underestimates the impact of her smoking on her children's health problems. Dr. Meidlinger confirmed that his report indicated the hours the children are in daycare when with Heather and that her schedule does not give her much time with the children during the week. He further confirmed that Heather indicated she would be fine with Jason having the children for extended periods of time when she's deployed somewhere for up to four months. One of Dr. Meidlinger's concerns with Jason was that Jason was not kind in his description of Heather to other people. However, he acknowledged that Jason "did very well with the children," that Jason was good at leading and teaching them, and there was a positive and warm relationship between Jason and the children. He described Heather as less flexible and spontaneous with the children, and that the children were less animated and less spontaneous with her. However, Dr. Meidlinger also suggested the setting may have caused anxiety, and that Heather is "afraid of being judged by male people in positions of authority." Jason challenged Dr. Meidlinger regarding his concerns that Jason might leave the area because of his relationship with a girlfriend in North Platte and regarding Jason working long hours during the summer.

*(vi) Dr. Cynthia Topf's Rebuttal*

Dr. Cynthia Topf has been a licensed clinical psychologist since 1987, and is self-employed in that capacity in Omaha, Nebraska. She testified as a rebuttal witness for Jason as follows. She has done "[p]robably more than about 500" custody evaluations, and "[p]robably around 200" reviews of other people's custody evaluations. Two previously received exhibits were remarked

and received again: the AACAP Summary Guidelines (Exhibit 25; also Exhibit 125) and the AFCC Model Standards (Exhibit 27; also Exhibit 109). Dr. Topf testified that these documents "present guidelines for appropriate methodology for combining psychology and the law." The AACAP Guidelines, full set (Exhibit 26) had been previously received, but was again offered and received as Exhibit 126. Dr. Topf indicated that she was familiar with the APA Guidelines, and that "[t]hey may not be as specific as some of the other guidelines in terms of some of the parameters, but they are guidelines."

Dr. Topf testified that she had reviewed Dr. Meidlinger's report on child custody, his court testimony, his deposition, and a spring conference syllabus. She did not interview either of the parties or the children. Based upon her review, she concluded that Dr. Meidlinger's "methodology was parent interviews, observation of parent and children – each parent and children. He used the [MMPI-II], and he did phone interviews with whom he thought were relevant parties." In Dr. Topf's "clinical opinion," Dr. Meidlinger's methodology did not meet the standard of practice for psychologists doing custody evaluations.

The specialty guidelines for forensic psychology published in American Psychologist Journal in January 2013 was received without objection as exhibit 127. Dr. Topf explained that forensic psychology is "working in the field, combining law and psychology," and this would include custody evaluations. Referring to exhibit 127, Dr. Topf said it did not appear that Dr. Meidlinger followed guideline 1.02 (impartiality and fairness) because he "believed" information received from Heather but he "discounted" information received from Jason. As for guideline 2.02 (gaining and maintaining competence), Dr. Topf testified that the purpose of this guideline is "especially in forensic psychology, to keep up with ongoing research, literature and practices in the field," and that she reviewed the syllabus from the conference that Dr. Meidlinger attended, and the seminar was not devoted completely to how to conduct custody evaluations. As for guideline 2.04 (knowledge of the legal system and the legal rights of individuals) and guideline 2.05 (knowledge of the scientific foundation for opinions and testimony), Dr. Topf said that it did not appear that Dr. Meidlinger complied with these guidelines.

Dr. Topf had never seen an evaluation include only one test, and as for the MMPI-II used by Dr. Meidlinger, Dr. Topf stated that this test has a primary and secondary use. The primary use "was originated in 1943 to help with diagnostic procedures . . . to look at clinical mental illnesses such as depression, schizophrenia, major mental disorders." Personality characteristics can be "found within each of the subscales or scales. So the personality characteristics, characterological issues is kind of a secondary focus." According to Dr. Topf, Dr. Meidlinger used the MMPI-II as a secondary, not primary use, as the report did not "talk about major mental illnesses, but he did offer characterological impressions," or personality factors. However, while reliable at the time the test is taken, these personality factors can change over time.

Dr. Topf thought it was significant that Dr. Meidlinger's "conversations with others in his report swayed his own opinion, left him with negative feelings, particularly about [Jason]," and he made conclusions about Jason's father "based on third-party reports without any objective assessment of his own." Dr. Topf stated that "one of the guidelines of forensic psychologists" is "that you don't give a diagnostic opinion on someone based on an outside party's information."

Again referring to exhibit 127, Dr. Topf stated that Dr. Meidlinger did not comply with guideline 2.07 (considering the impact of personal beliefs and experiences) because he "never addressed the fact that his personal beliefs or his personal experiences were contraindicating what either others were telling him or was being portrayed." As an example, she discussed Dr. Meidlinger's concern that Jason might work long hours since he sets his own schedule even though he was not doing so when he had the children with him. Another example was Dr. Meidlinger's concern about Jason moving to North Platte even though no one said he was going to do so; whereas, the fact that Heather had "moved multiple times" did not seem to matter.

Dr. Topf claimed that Dr. Meidlinger did not comply with guideline 9.02 (use of multiple sources of information) because "he failed to rely on more than one specific test in his assessment." As to guideline 9.03 (opinions regarding persons not examined), Dr. Topf stated that Dr. Meidlinger rendering opinions about Jason's father was a "violation" of this guideline. Dr. Meidlinger did not comply with guideline 10.02 (selection and use of assessment procedure) because he used only one source of testing, but also because of the "way that the testing was reported." She noted that the MMPI-II has three validity scales, and "you need to make sure that you report the clinical scales, their values." The scores need to be given, so "[i]t's impossible to interpret looking at it." Dr. Topf agreed that guideline 10.06 (documentation and compilation of data considered) indicates that raw data should be made available, and guideline 11.03 (disclosing sources of information and bases of opinions) covers the identification of sources of information used to formulate an opinion. She said "[i]t did not appear" that Dr. Meidlinger complied with this guideline.

Dr. Topf also testified that, contrary to Dr. Meidlinger's testimony that the MMPI-II showed that Jason had a propensity for violence, "[t]he word 'violence' is not associated with the [MMPI-II], at least as a major or minor category to look up." Additionally, Dr. Meidlinger's "reporting or believing" a teenager's [Jaleigh's] reporting of anger issues struck Dr. Topf "as significant" because "he didn't follow up on why she might have been saying that," and "[i]t appeared he used it as a conclusion that [Jason] has anger issues." Dr. Topf stated that "most of the teenagers I come across . . . disagree with parents at times and might say their parents have anger issues, especially when they're told no."

Dr. Topf also questioned whether Dr. Meidlinger had interviewed the children alone, and that she was not sure how one can arrive at "any conclusion when you don't know the children, haven't tested the children, at least interviewed them, see how they react. Even if they're very young children, the literature indicates from age two on, individual interviews with children are important." Observing parents with the children "is different," and the "child interview alone is an individual interview, and it's very important that you interview them alone when brought in with mother and also interview them alone when they're brought in with father, because some of the data might be different." When asked about how objective assessments (e.g. the MMPI-II) relate to parenting abilities, Dr. Topf stated the MMPI-II

> is probably the most widely used, but the most widely criticized assessment in child custody evaluations because it has nothing to do with parenting or custody. But if you use it to rule out major mental illnesses, that's important in terms of your ability to parent. If you take a look at some of the characteristics, how they interact in your parenting style,

especially looking at the needs of the children, you know, some children may have different personality characteristics that may or may not interact well with the parent characteristics. So, that's what we do. We need to be cognizant of the fact that we're using some tests which aren't made for custody evaluations, but they can be very valuable tools for the psychologists and the Court to get to know the psychological components and how they relate to the parenting of the children.

Dr. Topf stated that Dr. Meidlinger did use the MMPI-II to relate it to "their abilities or lack of abilities in terms of creating different relationships, like a marital relationship or adult relationship, but I don't believe I saw anywhere where he related that – related that bit of information as to how they might parent or it would impact parenting."

Based upon her knowledge, experience, research, and training, Dr. Topf rendered her opinion that Dr. Meidlinger's custody evaluation did not substantially comply with the standards governing custody evaluations for court purposes.

On cross-examination, Dr. Topf stated she had not been provided Dr. Meidlinger's interview notes, she had not asked for Dr. Meidlinger's raw data from the MMPI-II, and she did not interview any of the parties or the children. In reference to guideline 9.02 (use of multiple sources of information), Dr. Topf acknowledged that Dr. Meidlinger did interview the parties, observed each parent with the children, interviewed numerous individuals by telephone, and these did constitute multiple sources of information. She agreed that standard 6.1 of the AFCC Model Standards states that the use of formal assessment instruments is not always necessary and that the use of such instruments is within the discretion of the child custody evaluator.

### (vii) Decree

In the February 21, 2014, decree's section on child custody, the district court referred to Jason's challenge to Dr. Meidlinger's custody evaluation and recommendation, stating:

> As is clear under Nebraska Law the Court must make a determination of it's [sic] own and Dr. Meidlinger's opinion is only one factor in that determination. Dr. Meidlinger's main concern was about the father's obvious anger issues and his extended failures to support relationships with the mother. Dr. Meidlinger's opinion is only a small part of the reason the Court is awarding custody to the mother.

The district court reasoned that "because of the father's anger issues as evidenced by prior assault issues, his behavior at visitation exchanges and past aggressive behavior toward his wife that the mother can better provide for the emotional growth of the children. This factor favors placement with the mother."

The court went on to address additional factors considered, which were detailed in the background section above.

### (viii) Arguments on Appeal

Jason argues that the application of *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), should have resulted in the exclusion of the report and any testimony from

Dr. Meidlinger. Jason claims that Dr. Meidlinger failed to establish the reliability of his methodology or his application of his methodology to the facts at issue because he admitted that his methodology had not been tested or the subject of peer reviewed analysis or publication. "Dr. Meidlinger was unable to indicate that anyone had ever observed the specific application of his methodology, could not state that the application of his methodology had been the subject of peer reviewed analysis or publication and essentially stated he had invented both the methodology and the application of that methodology on his own." Brief for appellant at 44-45. Jason argues that the district court "failed to adequately explain the factors the court found to show the work of Dr. Meidlinger was reliable that the court relied upon in reaching its determination. It is not enough to say that this expert has testified before the court before." Brief for appellant at 45.

Heather argues that Dr. Meidlinger's methodology included conducting psychological testing of Jason and Heather (MMPI-II), conducting clinical interviews with them both and clinical observations with each of them with the children, gathering information from collateral sources, and reviewing documents. She points out that Dr. Meidlinger stated that it was typical for other clinical psychologists to use these same methods in conducting custodial evaluations and they are standard within the APA. Further, his methods are used at continuing education workshops, and his methods have been subject to peer review and publication.

*(ix) Legal Principles*

A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

The Nebraska Supreme Court held in *Schafersman*, *supra*, that when the opinion involves scientific or specialized knowledge, Nebraska courts should apply the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

> Under the *Daubert*/*Schafersman* analytical framework, when a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. **This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. The first portion of the analysis 'establishes a standard of evidentiary reliability.' The second inquiry, sometimes referred to as 'fit,' assesses whether the scientific evidence will assist the trier of fact to understand the evidence or to determine a fact in issue by providing 'a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'** 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.' 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.

*McNeel v. Union Pacific RR. Co.*, 276 Neb. 143, 152-53, 753 N.W.2d 321, 330-31 (2008) (emphasis supplied).

Further, in determining the admissibility of an expert's testimony, a trial judge may consider several more specific factors that *Daubert* said might "bear on" a judge's gatekeeping determination. *Schafersman v. Agland Coop*, 262 Neb. at 233, 631 N.W.2d at 877. These factors include whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. *Id*. These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances. *Id*.

Although in a bench trial, a trial court is afforded more flexibility in performing its gatekeeping duty under *Daubert* and *Schafersman*, *Daubert* standards must nevertheless be met. See *Fickle v. State*, 273 Neb. 990, 735 N.W.2d 754 (2007). *Daubert* is applied in a procedurally different manner in a bench trial in that the trial court often admits evidence first and then disregards it upon deciding it is unreliable. See *id*. In determining whether an expert's testimony is reliable, a trial court necessarily must first hear the testimony, and we presume that a trial court considers only competent and relevant evidence in rendering its decision. See *id*.

The Nebraska Supreme Court has previously considered the application of *Daubert, supra,* and *Schafersman, supra,* in a marriage dissolution action involving the custody of children. In *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004), a father sought joint custody of the minor children; the mother was awarded sole custody. The mother's evidence at trial included testimony from Dr. Thomas Haley, a psychologist licensed by the State of Nebraska whose practice included working with children and families and who had testified as an expert on custody issues on more than 100 occasions over the course of about 25 years. He testified as an expert and, over the father's objection, was permitted to give opinion testimony which generally supported the mother's position with respect to custody. Dr. Haley had interviewed and evaluated the parties and their children on two occasions, but did not perform a full custody evaluation, which Dr. Haley testified would require additional testing. The father objected to Dr. Haley providing any expert opinion since he had not performed a full custody evaluation. The trial court sustained the objection as to "methodology" and indicated further foundation was needed. The mother "then elicited Haley's testimony that his techniques were established and recognized in the profession of psychology, that they were peer reviewable, and that he had formed opinions to a reasonable degree of psychological certainty." *Id*. at 699, 687 N.W.2d at 200. Dr. Haley was then permitted to testify, over objection, regarding matters related to the children's best interests as may be impacted by the frequency of the children going between homes; however, he admitted that his memorandum was authored to address the circumstances existing under the temporary order and did not state an opinion as to which parent should be awarded custody.

As in the case before us, the father in *Robb*, *supra*, called Dr. Topf as a rebuttal witness; she testified that clinical opinion and observation would be the "very minimum of something that would be reliable," and that a proper custody evaluation "normally involves a minimum of 4 to 8 hours of direct contact with the children, plus testing time." *Id*. at 697, 687 N.W.2d at 199.

In the father's appeal in *Robb*, our Supreme Court stated:

[the father] does not challenge Haley's professional qualifications or the scientific reliability of the methodology used by psychologists like Haley in conducting child custody evaluations. Rather, he argues that Haley's opinions were inadmissible because he did not conduct a full custody evaluation or perform any of the testing that would have been included in such an evaluation. We understand this argument to be directed at the second component of the *Daubert*/*Schafersman* analysis, namely, whether the expert has reliably applied methodology which is itself reliable if properly applied.

*Robb v. Robb*, 268 Neb. at 701, 687 N.W.2d at 201.

The *Robb* court concluded that the record showed that Dr. Haley did not apply the accepted psychological methodology necessary to formulate the opinion that it would be in the best interests of the children to award permanent custody to the mother. The Supreme Court then proceeded to disregard the psychologist's opinion in its de novo review of the permanent custody issue; however, it did consider Dr. Haley's opinion regarding the children's behavior during the period the temporary order was in effect because that opinion was based upon Dr. Haley's "clinical observation and impression of the parties and their children at a specific point in time several months prior to trial." *Id*. at 701, 687 N.W.2d at 202.

In the present appeal, Jason challenges both Dr. Meidlinger's methodology and his application of the methodology. We will discuss methodology first, then we will address its application.

a. Methodology

As noted above, when considering the admissibility of expert opinion evidence, the trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *McNeel v. Union Pacific RR. Co.*, 276 Neb. 143, 753 N.W.2d 321 (2008). This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid; this first portion of the analysis establishes a standard of evidentiary reliability. *Id*.

Therefore, in considering the reliability of the methodology used by a psychologist in a child custody case, we note some of the legal principles set forth in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). In that case, the U.S. Supreme Court concluded that *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), applies to the testimony of experts who are not scientists, but that

the test of reliability is 'flexible' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Kumho Tire Co. v. Carmichael*, 119 S. Ct. at 1171.

Further, *Kumho* tells us that "'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'" *Kumho Tire Co. v. Carmichael*, 119 S. Ct. at 1175. "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co. v. Carmichael*, 119 S. Ct. at 1176. *Kumho* makes it clear that the trial judge needs the discretionary authority "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted," and "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire Co. v. Carmichael*, 119 S. Ct. at 1176.

With these principles in mind, we observe that the district court stated at the *Schafersman* hearing that Dr. Meidlinger was one of the few people he trusted to conduct a child custody evaluation and make a recommendation. The trial judge stated that he had "been doing this over 24 years, gone through a lot of people who make these – who do these evaluations, make recommendations. And he's one of the few whose opinion I trust." Subsequently, in its February 19, 2013, order, the district court concluded that Dr. Meidlinger met the standards to provide expert testimony--that he was licensed in clinical psychology and had conducted approximately 338 custody evaluations. The district court stated that Dr. Meidlinger was competent in his field, and that although the court was confident in Dr. Meidlinger's opinions, it had not always followed his recommendations. The court indicated it would disregard inadmissible evidence, and that many of Jason's objections went to the weight the court might give Dr. Meidlinger's opinion. The court further stated that judges make the final decision on custody, and that if Dr. Meidlinger's opinion is received, it "is only one piece of evidence that must be considered to determine custody." The court concluded it would allow Dr. Meidlinger to testify, and if his opinion was received, the court would state in the final decision whether it had relied on that opinion.

In the February 21, 2014, decree, the district court stated that the court must make its own determination on custody, that "Dr. Meidlinger's opinion is only one factor in that determination," and that "Dr. Meidlinger's opinion is only a small part of the reason the Court is awarding custody to the mother." It is evident that although the district court concluded Dr. Meidlinger's testimony was admissible, the court gave minimal weight to it when making a decision on child custody. As noted above, a trial court is afforded broad latitude in determining whether an expert's testimony is reliable. Further, *Kumho, supra,* tells us that the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. The peer-reviewed or publication status of a particular methodology and its application is but one factor available to consider; whether Dr. Meidlinger's methodology or its application has been peer-reviewed or not does not make his testimony inherently unreliable. Given the district court's broad latitude in determining reliability and that the test of reliability is flexible, we next consider Dr. Meidlinger's methodology to determine if the district court abused its discretion by concluding it was sufficiently reliable.

Dr. Meidlinger testified that his methodology involved: conducting clinical interviews with the parties separately, conducting clinical observations of each parent with the children, administering the MMPI-II, conducting telephone interviews with collateral sources provided to him by the parties, and reviewing documents provided to him by the parties. Dr. Meidlinger testified that he follows the APA Guidelines, and that they indicate that psychologists should take data from multiple sources, provide information related to the functioning of parents and the interaction between the functions of the parents and the needs of the child, and to focus on the "best needs of the child."

Jason's rebuttal witness, Dr. Topf, indicated she was familiar with the APA Guidelines, and that although they might not be as specific as some other guidelines, "they are guidelines." Dr. Topf testified that the AACAP Summary Guidelines and the AFCC Model Standards "present guidelines for appropriate methodology for combining psychology and the law." She noted that Dr. Meidlinger's methodology included parent interviews, observation of the parents and children, use of the MMPI-II, and phone interviews of 10 minutes or less. She testified that in her "clinical opinion," Dr. Meidlinger's methodology did not meet the standard of practice for psychologists doing custody evaluations. She testified that

> to assess the best interests of the children or the child, you need to have interviews of the child and perhaps even testing with the child. There need to be other assessments . . . at least a brief intellectual assessment, parent-child assessments, which can look at different issues in the parent-child relationship, other objective personality testing. We . . . usually use questionnaires. There are some specific ones created for child custody assessments which . . . are often open-ended questions about parenting, parenting styles, different parenting knowledge and abilities. If there are alcohol or drug questions, we do an alcohol or drug screen. And – and I think most psychologists would spend more than just a couple hours in interviews.

Other details of Dr. Topf's challenges to Dr. Meidlinger's methods have been set forth previously. In summary, while Dr. Topf suggested that more than one test or formal assessment instrument is a better practice, she admitted that the use of such tests are within the discretion of the child custody evaluator. She also acknowledged that the MMPI-II is a widely used test, and even if criticized, it helps to rule out major mental illnesses which can impact parenting. She also acknowledged that while some tests are not made for custody evaluations, "they can be very valuable tools" for psychologists and the court "to get to know the psychological components and how they relate to the parenting of the children." She noted that Dr. Meidlinger used the MMPI-II to address the parties "abilities or lack of abilities in terms of creating different relationships, like a marital relationship or adult relationship." This application of the MMPI-II appears reasonable since Jason and Heather's behaviors towards one another were an issue, and therefore their abilities with regard to creating and maintaining relationships were quite relevant in this divorce. Further, although interviews with children "are important" according to Dr. Topf, she did not indicate that this was a mandatory practice to establish a reliable methodology.

We find that most of Dr. Topf's challenges to how Dr. Meidlinger conducted his child custody evaluation appear to go more to the weight one should give his recommendation than to

the actual methodology he used. While she does challenge the lack of more testing and the lack of interviews with the children alone, most of her criticism is directed at Dr. Meidlinger's credibility in how he interpreted or gave credence to the information collected. For example, she questioned his reliance on a teenager's perspective of a parent, and she was critical of him drawing negative or speculative conclusions from otherwise neutral facts, such as thinking Jason was likely to move to North Platte simply because his girlfriend lived there with her children.

Bearing in mind Dr. Topf's concerns about Dr. Meidlinger's methodology, we have also considered his methodology under the AFCC Model Standards, which Dr. Topf testified contains guidelines for an "appropriate methodology for combining psychology and the law." We next discuss some key provisions from those standards.

The AFCC Model Standards state that its purpose is to promote good practice, provide information to those who use the services of custody evaluators, and to increase public confidence in the work done by such evaluators. While it is advisable for its members to conform their practices to the AFCC Model Standards, there is no enforcement mechanism. Child custody evaluations should be performed by qualified mental health professionals (i.e. a minimum of a master's degree in a mental health field) and such evaluators should "possess advanced knowledge of the complexities of the divorce or separation process, a working knowledge of the legal issues in divorce or separation in their jurisdictions of practice," and should "possess appropriate education and training." Appropriate records and communication should be maintained, and evaluators are encouraged to use peer-reviewed published research in their reports. As to data gathering, multiple data gathering methods are recommended, any chosen assessment instruments should be used with both parties, and interview times with each party should be the same when possible to create a sense of fairness and balance in the process. The use of reliable and valid methods is also discussed, and it is specifically stated that "the use of greater numbers of instruments . . . does not necessarily produce more reliability and validity in the data set."

The standards address assessing parents, children, and adult-child relationships. In observing parent-child interactions, the evaluator should be attentive to:

> (1) signs of reciprocal connection and attention; (2) communication skills; (3) methods by which parents maintain control, where doing so is appropriate; (4) parental expectations relating to developmentally appropriate behavior; and, (5) when parents have been asked to bring materials for use during the interactive session, the appropriateness of the materials brought.

Communication by telephone "is an acceptable means for obtaining interview data from collateral sources and as a supplemental technique with primary parties," and "evaluators shall conduct at least one in person interview with each parent and any other adults who are currently living in a residence with the child(ren) and performing a caretaking role." Collateral source information is recommended from multiple sources, and "[d]ecisions concerning the sufficiency of collateral source information shall be made by evaluators." Such sources might include: "oral and/or written reports from collateral sources; school, medical, mental health, employment, social service, and law enforcement records; computer files; financial information; and, video and audio data that

have been legally obtained." It is recommended that corroboration of collateral source information be obtained, especially when using such information to form the basis of an opinion.

We find no significant departure by Dr. Meidlinger from the AFCC Model Standards, and, in fact, his methodology encompasses their key provisions. He conducted interviews with the parties, observed the children with each parent, administered the MMPI-II, reviewed documents submitted by the parties, and conducted interviews with collateral sources. The totality of these sources of information form a methodology for assessing child custody matters which is consistent the AFCC Model Standards, and further, Dr. Meidlinger's methodology is not inconsistent with Dr. Topf's description of an acceptable methodology. Finding Dr. Meidlinger's methodology in performing a child custody evaluation to be valid, we next evaluate the manner in which that methodology was applied in this case.

### b. Application of Methodology

Once the validity of the expert's reasoning or methodology has been satisfactorily established, any remaining questions regarding the manner in which that methodology was applied in a particular case will generally go to the weight of such evidence. *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof remain the traditional and appropriate means of attacking evidence that is admissible, but subject to debate. *Id*.

In addition to determining the scientific reliability of proffered expert testimony, a trial court's gatekeeping function under the *Daubert*/*Schafersman* standard requires that it determine whether such opinion testimony can properly be applied to the facts at issue. This inquiry, sometimes referred to as 'fit,' assesses whether the scientific evidence will assist the trier of fact to understand the evidence or to determine the fact in issue by providing a 'valid scientific connection to the pertinent inquiry as a precondition to admissibility.' Under the *Daubert*/*Schafersman* analysis, **expert testimony lacks 'fit' when a large analytical leap must be made between the facts and the opinion.**

*State v. Herrera*, 289 Neb. 575, 592-93, 856 N.W.2d 310, 326-27 (2014) (emphasis supplied).

Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. *McNeel v. Union Pacific RR. Co.*, 276 Neb. 143, 153, 753 N.W.2d 321, 330-31 (2008). Stated another way, if an expert's reasoning or methodology underlying his or her testimony is valid, then the next question is whether the finder of fact can properly apply that reasoning or methodology to the facts. See *King v. Burlington Northern Santa Fe Ry. Co.*, 277 Neb. 203, 762 N.W.2d 24 (2009).

*McNeel, supra,* provides a good example of when the application of a methodology, or "fit," cannot be properly applied to the facts. In *McNeel*, a freight train conductor claimed he inhaled fumes when his train was making a trip, and that these fumes caused him injuries. One of the conductor's experts diagnosed him as suffering from toxic encephalopathy caused by his inhalation of an unspecified toxin while employed by the railroad. The expert relied upon a scan widely used and accepted in the diagnosis of toxic encephalopathy when used in conjunction with

other examination techniques. Another of the conductor's experts testified that her testing established that the conductor experienced a toxic injury that led to declining cortical function over time. Our Supreme Court concluded that even if the expert opinions diagnosing toxic encephalopathy

> was the product of scientifically reliable methodology, it is simply too great an analytical leap to conclude that it was caused by some act or omission on the part of [the railroad], given that the experts could not identify any toxic agent. Due to this lack of 'fit,' the opinions of [the conductor's] experts would not have assisted the trier of fact in understanding the evidence or determining a fact in issue.

*McNeel v. Union Pacific RR. Co.*, 276 Neb. at 155, 753 N.W.2d at 332.

In the present matter, there was no "large analytical leap" between Dr. Meidlinger's evaluation and opinion and the facts at issue--child custody; it was in fact, directly related. While Jason raised some fair challenges to certain conclusions drawn by Dr. Meidlinger from information he collected, this goes more to the weight to be given Dr. Meidlinger's opinion rather than whether it was admissible. Questions regarding the manner in which a methodology is applied in a particular case will generally go to the weight of such evidence. *Schafersman v. Agland Coop*, *supra*. We conclude that there was a valid connection between Dr. Meidlinger's assessment and the pertinent inquiry regarding custody of the children which could assist the trial judge, the ultimate trier of fact. Therefore, the application of Dr. Meidlinger's methodology was properly applied to the facts of the case; the trial court had the discretion to determine what weight to give his testimony and opinion.

We also are reminded that in the context of a divorce action and the expert opinion of a psychologist, our Supreme Court understood the second component of the *Daubert*/*Schafersman* analysis to be "whether the expert has reliably applied methodology which is itself reliable if properly applied." *Robb v. Robb*, 268 Neb. 694, 701, 687 N.W.2d 195, 201. While stated slightly differently than the "fit" analysis above, we can see that the *Robb* court nevertheless looked to whether there was a valid connection between Dr. Haley's assessments at the time of the temporary order and the pertinent inquiry at trial--permanent custody. Our Supreme Court concluded that the record showed that Dr. Haley did not apply the accepted psychological methodology necessary to formulate an opinion on permanent custody; in other words, Dr. Haley had not performed a full custody evaluation and could therefore not render an expert opinion on permanent custody at trial. That was not the situation in the case before us. Dr. Meidlinger performed a full custody evaluation, his methodology was reliable, and his expert opinion on child custody had a valid connection to the pertinent inquiry at trial on this issue.

Finally, Jason also contends that *Betz v. Betz*, 254 Neb. 341, 571 N.W.2d 406 (1998), should be applied here and should have resulted in the exclusion of Dr. Meidlinger's report on his custody evaluation. Jason seems to be arguing that hearsay within the report is not admissible. However, the *Betz* case largely focused on distinguishing between the role of a court-appointed guardian ad litem and a court-appointed attorney for a child; that portion of a guardian ad litem's opinion which was based upon hearsay not otherwise admissible in court was not given credence.

With regard to expert testimony, Neb. Rev. Stat. § 27-703 (Reissue 2008) provides that the facts or data reasonably relied upon by experts in their particular field in forming opinions or inferences need not be admissible in evidence. Expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. *King v. Burlington Northern Santa Fe Ry. Co.*, 277 Neb. 203, 762 N.W.2d 24 (2009). If the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded. *Id*. An expert's opinion must be based on good grounds, not mere subjective belief or unsupported speculation. *Id*. While there may have been some conclusions drawn by Dr. Meidlinger that appear to be more subjective belief than "good grounds," we cannot say that the overall underlying data found in his report was so lacking in probative value and reliability as to warrant its exclusion.

For the foregoing reasons, the district court did not abuse its discretion in allowing Dr. Meidlinger's testimony and report regarding his assessments and conclusions pertinent to child custody.

(b) Evidentiary Rulings

Jason assigns that the "trial court erred in making certain evidentiary rulings contrary to the Nebraska Rules of Evidence." In his argument in support of this assigned error, he again claims that Dr. Meidlinger's testimony and report should not have been admitted into evidence. This has already been addressed.

Jason also claims the court erred by not allowing him to obtain "the raw data of Dr. Meidlinger with respect to the [MMPI-II] after he changed his testimony concerning that test." Brief for appellant at 49-50. However, Jason does not discuss why this was an error, nor does he provide any legal authority to support his assertion. Therefore, we do not address it.

Finally, he claims that "there were objections made to characterizations made by the witness, Dan Adams, foundational objections were made during the testimony of Dr. Meidlinger, and foundational and hearsay objections were made during the testimony of [Heather] that should have been sustained." Brief for appellant at 50. Jason points out that an appellate court should not consider any evidence "wrongly received by the trial court." *Id*. We note that Jason does not direct us to any specific part of the record where these objections were made. It is not the function of an appellate court to scour the record looking for unidentified evidentiary errors. *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005). That said, we have been mindful of objections in our de novo review of the record, and to the extent that some evidence may have been improperly admitted, the considerable admissible evidence in the record supports the conclusions of the district court, except where specifically noted later in this opinion. To constitute reversible error in a civil case, a trial court's admission or exclusion of evidence must unfairly prejudice a substantial right of the litigant complaining about the ruling. *Tolliver v. Visiting Nurse Assn.*, 278 Neb. 532, 771 N.W.2d 908 (2009). We cannot say that occurred here.

(c) Physical Custody of Children

Jason asserts that the district court erred by not awarding physical custody of the children to him. He begins by questioning our standard of review, so we first set forth those legal principles and discuss Jason's points regarding the same, and then consider the evidence pertinent to physical custody.

*(i) Standard of Review*

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). This standard of review applies to the trial court's determinations regarding custody, child support, the division of property, alimony, and attorney fees. *Id.* An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). Although an appellate court reviews the trial court's determinations de novo, the trial court's determinations are initially entrusted to its discretion and will normally be affirmed absent an abuse of that discretion. See *id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

*(ii) Jason's Concern Regarding Standard of Review*

With regard to an appellate court's standard of review in dissolution actions as set forth above, Jason says, "Seemingly, the law is set against itself." Brief for appellant at 51. He explains:

> The standard for review for an abuse of discretion is different than that of a de novo review. A de novo review calls for the appellate court to look at matters *independently* of what the trial court decided and makes its *own* determinations and conclusions with respect to the matters at issue, seemingly without reference to the trial court's findings. A review for abuse of discretion would instead have the trial [sic] court only interfere with the decision of the trial court if the appellate court finds that the reasons the trial court relied upon are untenable or unreasonable, or if its actions are clearly against justice or conscience, reason, and evidence. These are very different standards.

*Id.* (Emphasis in original.)

Jason's perspective is understandable given that he sees our standard of review in custody matters as two separate standards: (1) de novo on the record, and (2) abuse of discretion; and that these two standards do not seem consistent with one another. However, our standard of review in dissolution actions is only one standard, as set forth in *Coufal v. Coufal*, 291 Neb. at 379, 866 N.W.2d at 76, wherein the Nebraska Supreme Court states our standard of review is "de novo on

the record to determine whether there has been an abuse of discretion by the trial judge." Also, as set forth previously, although an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue, the trial court's determinations are initially entrusted to its discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, *supra*.

Although a de novo review of the record requires us to look at the evidence with fresh eyes, so to speak, we must then consider that evidence against what the trial court ultimately decided, and unless the trial court's final decision constitutes an abuse of discretion, we must let it stand. For example, if our review of the evidence reveals favorable and unfavorable evidence for each parent in a custody case, and perhaps the custody decision could have gone either way, we cannot say the trial court abused its discretion by choosing one parent over the other. Such a decision cannot be clearly against justice or conscience, reason, and the evidence when the evidence supports either parent having custody.

We proceed now to the substance of Jason's argument regarding physical custody of the children.

### (iii) Jason's Arguments on Physical Custody

Jason contends the court "relied upon matters that were not properly put before it." Brief for appellant at 51. Jason refers to that part of the district court's order indicating the mother could better provide for the emotional growth of the children because the father has anger issues evidenced by prior assaults, behavior at visitation exchanges, and past aggressive behavior towards his wife. With regard to prior assaults, Jason asserts that "the only evidence of prior assault issues came in through the report of Dr. Meidlinger concerning his recommendation. In his report, Dr. Meidlinger discusses assault cases [Jason] was involved in well over a decade ago." Brief for appellant at 51. With regard to visitation exchanges, Jason says there is only the testimony of Dan Adams "who saw one exchange that consumed less than two minutes of time, after which the parties separated." *Id*. And as to Jason's past aggressive behavior toward his wife, Jason argues that "[m]uch of the evidence concerning [Jason's] behavior toward his wife amounted to a he said/she said situation," and that "[t]he court in its decision made no mention of the multitude of witnesses [Jason] produced that testified repeatedly that no one saw any evidence of problems in the marriage." Brief for appellant at 52. "Some of these witnesses could be described as very close to the couple while others less so, but still in frequent contact with them. Yet, *no one* saw a hint of any problem." Brief for appellant at 52-53 (emphasis in original).

Jason also takes issue with the district court's conclusion that Heather has "done a good job of parenting and the Court does not want to disrupt a relationship that is working." Jason argues that there was "no evidence of that." Brief for appellant at 53. He claims no one testified that the children are doing well. Rather, he claims: the children have been in six different daycares since Heather moved them to Lincoln; that she has lived in multiple homes; that she treats the children for allergies they do not have while she exposes them to secondhand smoke; that she has not followed through with recommendations from physicians that she enroll the children in counseling for what she reports as behavioral problems; that the children are in daycare 10 hours per day; and that they have most of their meals on the couch. "The evidence was not that she was a good parent

and the children are doing well. In fact, the *evidence* was exactly the opposite." Brief for appellant at 53. (Emphasis in original.)

Jason also takes issue with Heather's credibility. He acknowledges that it is for the trial court to assess credibility, but Jason argues that in this case, "the misleading statements and outright untruths as told by [Heather] are legion." Brief for appellant at 53-54. In that regard, Jason points out that Heather misrepresented her income at the beginning of the litigation, denied telling Dr. Meidlinger certain information, and made up stories that did not occur. He compares Heather's "multiple missteps" with Jason's producing evidence to back up what he was saying, and producing witnesses to verify his relationship with the children. Brief for appellant at 54.

Jason also takes issue with Heather's character, noting that Heather would not agree "to even the simplest of requests," and "she will take whatever steps she can to minimize the father's role in the children's lives." Brief for appellant at 55.

Finally, Jason discusses the court being "distracted by other factors," such as it being "clearly disturbed" that Jason recorded interactions, a process, Jason says "that has served him well in this litigation." *Id*. Jason also argues that the court appeared to be influenced by the behavior of witness Amy Parker being visibly upset, rather than listening to what was said.

We now consider the evidence produced at trial pertinent to the issue of physical custody. As set forth in our discussion on standard of review, we consider this evidence independent of the trial court's assessment of the facts, and will then determine whether the district court abused its discretion in reaching its decision on physical custody in light of this evidence.

*(iv) Jason's Witnesses*

a. John Burkholder

Jason's father, John Burkholder, a "semi-retired" farmer, testified as follows. Prior to Heather moving to Lincoln with the children, he had contact with the children "[a]lmost on a daily basis at times; two or three times a week probably all the time." In September following the children's move to Lincoln with Heather, he observed his grandchildren's "attitudes and disposition really changed fast," in that "the bubbliness of them just went away," and "they're just changed individuals." John was present at exchanges for six months and observed that when it was time for the children to return to Lincoln, "they really cry a lot when they know they've got to leave Jason," and they "just cling to him, hug him," and cry. John did not see them cry or cling to Heather during an exchange; the children would be excited and "come a running."

John also questioned decisions by Heather related to medical care for the children, accepting work assignments that were voluntary, not responsibly telling Jason or John she wrecked the front end of a vehicle provided to her by John, and not properly supervising the children which put them at risk of harm. As examples of the latter, John indicated the family was leaving a restaurant, with Heather and "Maddy" exiting together, but Heather was going one way to talk to someone while Maddy, age 3 at the time, went another direction down the sidewalk, and John "had to run out and stop her" and bring her back. There were some instances at exchanges in Aurora where one child or the other took off running; on one occasion Heather had to grab Maddy and "knock her down" before she got to the road, and another where Taylor "got loose and took off across the drive-through and about got hit." In the summer of 2011, John observed "a number of

times" when the children would be playing outside in the back of their house, with Heather back there with them, when the children would "take off around the front for a while." John would "have to go around and get the kids or ask Heather to check on them," and the children would "be clear around the front of the house along a busy street."

John observed that Jason "cooks a lot," and does "a good job" caring for the twins. Jason "gets down on the floor and plays with them," he reads to them, and gets them ready for bed. John said he and his grandchildren were "attached to each other," they loved going "out to the farm," so it was "devastating" when the children moved to Lincoln. John believed the children would be better off in Holdrege than with their mother in Lincoln because the "safety of the kids concerns me," and "[i]f they're out here, they will grow up in a rural environment that is safer," and they will "have a better chance growing up as a normal child and teenagers through the smaller school," and "participate in 4-H, FFA, sports, which has been very important to our family." John also expressed the benefit of being closer to extended family in the Holdrege area and being part of the Holdrege community.

### b. Joyce Burkholder

Jason's mother, Joyce Burkholder, testified she had been married to John for 41 years and she had been employed as a receptionist at Family Medical Specialties in Holdrege for 30 years. Before Heather moved to Lincoln with the children, Joyce saw the twins daily, and "if either Jason or Heather needed to be away, John and I would help take care of the twins." It was a surprise to her when Heather left; she "[d]idn't see it coming." When in Jason and Heather's home, she observed Jason doing laundry, and doing dishes "most of the time," and saw both parents get the children ready for bed.

She recalled that Jason and Heather had an argument at the wedding reception for Jason's brother, Jared, and that Heather did not want to ride home with Jason; Joyce offered Heather a ride and told her she could come to their home. She had heard Jason and Heather call each other names; Jason "might have called [Heather] a bitch at one point." Joyce acknowledged that she had encouraged Jason to "go to the doctor," when the children were "around two," that Jason had been prescribed medication for depression, and when asked if she was aware whether Jason took the medication, she responded, "I don't believe so." However, she no longer thought he needed the depression medication.

### c. Donetta Sandell

Donetta Sandell, a receptionist at Family Medical Specialties for five years, testified that Heather had worked at Family Medical Specialties for a few months in their lab. Sandell had known Jason for 4 years and his mother 20 years. She observed Jason with the twins at the grocery store and at the medical clinic, as well at ball games and parades. Sandell described Jason as a "loving and caring parent," and being close with his parents. Conversely, when she saw Heather with the children at the clinic, "I just didn't necessarily feel the motherly instinct that I see with a lot of our patients."

### d. Justin Norris

Justin Norris, a maintenance employee for the Phelps County courthouse, testified that he and Jason "grew up together." Norris' children attended the same daycare (Trinity Childcare) as the twins. In his prior employment with the City of Holdrege, he would pick up his children from daycare "about 4:30 when I got off," and he would see Jason there "most of the time." Norris described Jason as a "[p]retty good father," and he never saw Jason get angry with the children. On cross-examination, Norris acknowledged that Heather had a loving, caring relationship with the children based on his observations.

### e. Cherie Gannon

Cherie Gannon, owner of C and D Bottles, has known Jason since her oldest son was in high school; "they were best friends." Gannon would see Jason at the daycare when she picked up her "grandkids," and sometimes passing in the store. In her 8 years of being at the daycare once or twice a week, she never saw Heather picking up the children. In the summer of 2011, shortly before Heather moved to Lincoln, Gannon saw Jason and Heather at the funeral of Jason's grandfather. She observed Heather to be supportive of Jason; she did not see any sign of fear or hesitation from Heather towards Jason. Gannon described Jason as "[a] good parent," and said she was there to support Jason because "if somebody is disappointed in a relationship, they shouldn't just run off . . . you need to work it out. The children should not be involved in just running away. I think he would be the better parent." On cross-examination, Gannon agreed that she told Dr. Meidlinger in July 2012 that Heather seems like a good mother.

### f. Carrie Cox

Carrie Cox, a graphic designer for the North Platte Telegraph, testified that she has been in a dating relationship with Jason for just over a year. She lives in North Platte and has four children, ages 4 through 16. She and Jason get together every other weekend; Jason usually travels to North Platte, Cox's appearance at trial was only her second time in Holdrege. Cox testified that Jason got along very well with her children, and she has observed him be "kind and patient" with his children, and Jason's children are "very affectionate with him and with me." She has never seen Jason yell or throw things or lose "his cool" or act inappropriately towards her; she thinks there has been a "time-out" with Jason's "kids," and she says he redirects his children when necessary. On cross-examination, Cox stated that she met Jason online in October 2011 and did not know him prior to that time.

### g. Tim Adkins

Tim Adkins, a meat market manager for a company in Holdrege, has known Jason through his brother, John, since about 1994, and saw Jason with his children "around town once in a while, but mostly [Adkins] would see Jason bring the kids into the store when he was shopping" two to three times per week. Adkins' wife worked with Jason's mother at the clinic. Adkins supported the children being with Jason "[b]ecause of the way I've seen him interact with the children when he's in the store. I believe the children interact with him, they seem perfectly happy. He's got a

good family base here. He's got great parents who would be great grandparents for the children. And I believe that's what would absolutely be most important for the children."

h. Jason

Jason testified that he met Heather online, and that he had a child from a prior relationship, Jaleigh Burkholder, for whom he pays child support. Jason acknowledged living with Ann Choat in 2004 and 2005, that Choat had a son, and that Jason and Choat were involved in a physical altercation.

Jason discussed the protection order Heather requested in August 2011 when Heather was spending time in Lincoln and he was in Holdrege with the children. Heather had been working in Lincoln and coming home on weekends for parts of May, June, and July 2011. Leading up to August 2011, Jason had no indication that Heather was unhappy or thinking of leaving. Jason testified that during the marriage Heather called the police to their home two or three times.

Jason claimed that Heather misrepresented her income for temporary support purposes, and she cancelled health insurance coverage for him and Jaleigh, which he only learned about from Jaleigh's mother. Jason was frustrated by this, explaining that when a person is on active duty, the health insurance is paid for as part of the member's compensation.

Jason testified that once Heather relocated to Lincoln, the children had four daycare providers: an in-home daycare, Little Munchkinland, a nanny for the summer, and then Cedars. The children had only been in one daycare in Holdrege--Trinity Child Care, and Jason could not remember the children ever being there for a full 40-hour week. They were in daycare "eight hours on [sic] a day's time at the most," as compared to his understanding that Heather had the children in daycare for 10 hours a day in Lincoln. Jason discussed how Heather would get off work at 2 p.m. when she worked shifts at Christian Homes (in Holdrege), but she would not pick up the children from daycare because she reasoned that it was naptime and she wanted to wait until naptime was over. Jason also pointed out that the materials from the children's daycare, Cedars, did not show him as the emergency contact for the children; instead it showed a Dean Barrett, and further, the materials indicated that Jason could only have supervised access to visit the children.

Jason said Heather was deployed six times after the twins were born, spending anywhere from 2 to 6 weeks in Alabama, Florida, Wisconsin, Michigan, Guam, and England. When both Heather and Jason were in the Guard and they had drill weekends, the children would stay with Jason's parents. Once Jason was no longer in the Guard and Heather had to be away, the children stayed with Jason. Jason stated that he was seeking custody of the children

> [b]ecause I love and adore my children. I need them just as much as they need me. . . . Until they were taken away from me, I was able to tell my children every single day of their life that I loved them. Their whole world, my whole world, was ripped apart that day. . . . They had everything here. They had family. They had the love of both their parents. . . a wonderful home . . . a wonderful school. . . . We need each other.

Jason said he could give them stability, family and honesty, "a life they deserve." Jason testified that he had not been able to work with Heather on issues of visitation, and that he has "tried over and over and over." Jason said that he wants to be able to work with Heather and be reasonable

with her, and he believed they could be reasonable, but during litigation, this has been difficult because "[t]here's no consistency. I mean, everything keeps changing."

### i. Dr. David Meduna

Dr. David Meduna, a pediatrician in Lincoln testified via deposition (Exhibit 60). He saw Madisen and Taylor on November 7, 2011; Heather was present with the children. Dr. Meduna was asked about forms filled out by Heather, in which the mother's name was provided, but not the father's name, and the father was noted to be bipolar and abusive to the mother. There was also discussion about Heather's request for Dr. Meduna's office to withhold information from Jason, which they refused to do without a court order. Dr. Meduna indicated there were no further appointments after November 7.

### j. Chris Butler

Chris Butler testified via deposition (Exhibit 61). She knew Jason and Heather because Jason's brother, John, Jr., worked with Chris' husband at the Phelps County Sheriff's Office. The couples would be together for birthday parties, camping, barbecues, boating, and generally out and about in the community. She considered Jason "a good dad, encouraging," and she observed him tell them "he loves them," and "give hugs and kisses on numerous occasions."

On one occasion when Butler knew that Jason was at military training, she stopped by to see Heather and the children, and she remembered "that [Heather] had taken time out to set up the Skype for the kids," to see and talk to Jason. She noted that Jason was able to redirect his son's behavior, was aware of his daughter's nightmares, and she knew he liked to cook and bake. When Jason and Heather were both present with the children, Butler did not observe either parent doing more of the caregiving than the other.

Butler discussed Heather contacting her to help her move; Heather indicated she had been at the "Safe Center" and did not tell Butler in advance that she was moving because she "had to keep everything the same," and "had to act like there was nothing going on." Butler was aware that Heather had filed for a protection order; Heather told her they argued, but never indicated Jason was abusive towards her. Butler further observed Heather at the funeral for Jason's grandfather shortly before Heather moved to Lincoln. She observed Heather to be "very loving towards him," "rubbing his back," and "holding his arm and just being very supportive." Although Butler described Heather as "a good mom," she did not understand Heather "being secretive and leaving." Butler testified in support of Jason because "Jason has stayed grounded, he's stayed here; and the love that he has for his kids has not changed, and he still treats them as if he was with them every day." Butler also believed the children should return to Holdrege because "smaller communities . . . are better, you know more people; family is here, close friends; more opportunities for kids."

On cross-examination, Butler did recall Heather telling her once that Jason had thrown things at her, and on one occasion told her that Jason had locked her out of the house, which Butler recalled being after the twins were born. Butler recalled telling Dr. Meidlinger that she had seen Jason angry once, when they went camping July 4, 2011; apparently Jason got into an argument with his brother, John, Jr., about parking, but Butler did not see if there was a physical altercation.

Butler acknowledged that she could not say anything bad about Heather as a parent, "She's a good mom."

### k. Carolyn Reddish

Carolyn Reddish testified via deposition (Exhibit 62). She was landlord and neighbor to Jason and Heather beginning in December 2010; she has known Jason's mother for 40 years. She would see Jason or Heather and the children every other day or so in the backyard, since their backyards were adjoined. She observed Jason and Heather "to parent a lot together," and she did not see any signs of abuse or yelling or tension between them. Reddish supported Jason having the children in Holdrege because "I don't see any reason not to, because his family, the rest of his family lives here, and it seems appropriate to me for him to have the children." On cross-examination, when asked if Heather was a caring and loving mother, Reddish stated, "Yes. Yeah, I can't say that she wasn't."

### l. Charles Christie

Charles Christie, a physician's assistant for Family Medical Specialties in Holdrege, testified via deposition (Exhibit 90). He first saw Jason as a patient 10 years prior and has had at least ten contacts with him since then. Christie was asked about five specific entries contained in Jason's medical records (Exhibit 93) referring to depression or anxiety between 1995 and 2012. In these records, there are references to "anxiety," "a history of bipolar symptoms," "[e]pisodes of mania and then severe depression," and "issues with alcohol use . . . under control." When asked if these records indicate there is any chronic problem, Christie answered, "Yes." He defined chronic as, "Just persistent, to where it's gone on over years." However, Christie further indicated that such a history does not necessarily mean that depression was present at the time of the examinations.

### m. Dr. Jeffrey Berney

Dr. Jeffrey Berney, a physician with Family Medical Specialties in Holdrege since 1999, testified via deposition (Exhibit 91). He acknowledged that Jason's mother worked at the same place and preceded his employment there. Dr. Berney discussed when he saw Madisen in September 2010 for neck and shoulder discomfort, she was diagnosed with a clavicle fracture. Based upon his notes, Heather, who brought Madisen to the doctor, said that Taylor grabbed Madisen by the arm and head, pulling her out of the crib, landing on her shoulder and neck. The twins were 26 months of age; Dr. Berney stated it was "essentially impossible" for a 26-month-old to reach and pull another 26-month-old toddler out of a standard crib. On cross-examination, he agreed that if the crib had a railing that lifted up and down, and the railing was down, then it "would be possible" for one child to pull another out of the crib. Dr. Berney further acknowledged that if he had had any suspicions regarding the explanation given at the time, he would have had an obligation to report it under the law, and he did not make such a report.

### n. Dr. Thomas Smith

Dr. Thomas Smith, an internal medicine doctor at Family Medical Specialties in Holdrege, testified via deposition (Exhibit 92). He has seen Jason, his parents, and his two brothers over the

course of his 33 years practicing in Holdrege. Dr. Smith had no information that would make him concerned about Jason's ability to care for his children. Dr. Smith was also asked to look over Jason's medical records. He discussed the December 2009 record, indicating that Jason expressed stress symptoms, was not sleeping well, had anxiety and stress, and some symptoms of depression. Jason indicated issues with using more alcohol than appropriate, but Jason felt "that had come under control." Jason was working part-time; his primary responsibilities were caring for his children while his wife was working out of the area--in Lincoln. In addressing the handwritten section where Dr. Smith had written "bipolar-like symptoms," Dr. Smith explained that "bipolar is a clinical diagnosis used in psychiatric realms of an individual who has symptoms of mania or hyperactivity and then symptoms of depression. In my course of conversation with Jason at that point in his life, he had both of those extremes of mood symptoms." Dr. Smith stated that bipolar disorder is a disease that "will raise its head in the 20's, and then we see it as a chronic disease from that point on." However, to Dr. Smith's knowledge, he had not seen that problem re-present itself in Jason, and that "[t]here could be other explanations for those symptoms other than bipolar." And although Dr. Smith did prescribe for Jason "a medicine that we use for bipolar," it was Dr. Smith's recollection that Jason never filled the prescription.

### (v) Heather's Witnesses

### a. Daniel Adams

Daniel Adams witnessed a scene between Heather and Jason at Love's gas station in Aurora on February 3, 2013. He did not know Heather, but subsequently learned who she was. Adams walked past Heather and saw her on her phone; she was crying. (Heather testified she was speaking to a friend and coworker.) Adams went and sat in his truck, waiting for his son, and listened to his radio. He saw Heather get in her van and leave. He then saw a man, subsequently identified as Jason, pull up in a pickup with children in the front seat. Heather pulled up with her van next to Adams and got out. Jason appeared upset, took the children out of the truck, and Heather picked up her daughter. They were talking; Jason was yelling. "The little boy was grabbing onto his mom's leg. The daughter was grabbing her mom and veering away." Jason was yelling, however, Adams could not hear what was being said. Adams observed something in Jason's arms, he thought it was clothing, "but something was actually tossed from his chest towards her." Heather's back was to Adams so he could not observe whether it dropped to the ground, but "it went somewhere towards her abdomen or towards the child." This all took place in front of Adams' pickup. Adams testified Heather was upset, "[s]he kept wiping her eyes." When Heather walked away towards the store, Jason got in his truck and drove away. Shortly after, Jason returned and removed a suitcase from his truck and "slammed it on the roof of her van and drove away." Adams told Heather the suitcase was on the roof so she would not drive off with it up there.

When Adams was asked about being upset and worried about what he witnessed, there was a relevance objection from Jason which the court overruled and stated: "[T]wo things concern me about this. One, that the children were clinging to their mother; two, him slamming the suitcase on the roof. Not a good thing to do in a custody exchange. So I do want to hear the answer to this question. You may answer the question."

Adams responded that he "was worried about both parties," because he had gone through anger management himself and had problems with anger all his life; he did not "want to see them go through what [he] went through."

Adams admitted on cross-examination that he never called the police, nor sought assistance from anyone in the store, and that the entire exchange took less than 2 to 3 minutes. Jason offered Exhibit 103, alleged to be a recording of the exchange; it was received without objection. Adams also acknowledged that he was acquainted with the Burkholder family and that he had heard good things about them.

In rebuttal testimony, Jason agreed this exchange took place in February 2013, and that he was frustrated about them being in different exchange locations. When he met up with Heather, he told her "[t]o stop putting on a show," and "[q]uit playing games." He said he never yelled or swore at her.

### b. Amy Parker

Amy Parker and Jason have a 16-year-old daughter, Jaleigh; Parker has custody. Parker testified as follows. Jason had parenting time every other weekend and alternating holidays. When Jaleigh was younger, Jason was supposed to be meeting Parker to return Jaleigh to her, but Jason called and said "he was going to take her, and [Parker] was never going to see her again." Parker contacted the Lincoln police. Parker was hesitant to testify in the present matter because she did not "want there to be repercussions for my relationship with Jason or for his relationship with Jaleigh. I don't want him to hold it against her." Parker said Jason has been vindictive, and that "[f]or the most part" she has been able to co-parent with Jason, but "[i]t hasn't been ideal."

Parker testified that Jason gave Jaleigh a car in the past year but then took it away because there was some damage to it and "[Jason] felt [Jaleigh] wasn't responsible enough to have the car." On Jaleigh's 14th birthday when she was supposed to be with Jason for two weeks, Jaleigh called Parker crying because of a fight between Heather and Jason. Parker had to go pick up Jaleigh. Parker also testified about Jason being verbally abusive to her "[d]uring our whole relationship" for the past 17 years. This included "name-calling," and "[t]hreatening to take Jaleigh away from me. Things like that. It was mostly like name-calling, putting down." However, on cross-examination, Parker admitted that in December 2012, she discussed the possibility of Jaleigh living with Jason because Parker "didn't know at that time what [she] was going to do because of [Jaleigh's] behavior."

### c. Reverend Darren Stroh

Reverend Darren Stroh, minister at First Baptist Church in Holdrege, saw the parties for spiritual counseling for two sessions, and one with Heather privately. He recalled that he told Dr. Meidlinger "[t]he couple presented with struggles of anger, control, and trust between the two of them."

### d. Heather

Heather was a medical service technician with almost 19 years of military service. She was a master sergeant at the time of her trial testimony in September 2013, and she had been active

duty military from November 1994 to June 2004. In June 2004, she enlisted into the Air Force Reserves. In August 2008, she and Jason transferred to the Guard. After the children were born (July 2008), Heather stayed home with them for their first 18 months, other than Guard drill. She then worked part-time as a certified nursing assistant (licensed since 2006) with Christian Homes, an assisted living home for the elderly, until she and Jason separated in August 2011.

According to Heather, approximately two weeks after moving to Nebraska, Heather had to call her father because "I was being kicked out." Heather observed changes in Jason, including him being "a lot more aggressive," "[h]e yelled," "[h]e was rude, which wasn't who I had met previously. It was like he did a 180."

Heather also recalled an incident in December 2009 when they were in Minnesota for Christmas with her family. They stayed in a hotel and planned a gathering for Heather and her girlfriends. Jason purchased three hotel rooms: one of which was used by "us three girls . . . catching up and having some wine." Jason, Jaleigh, and the twins were in a separate room. Sometime past midnight, "there was a loud knock at the door," "Jason was standing there," and "I heard him say, get my fucking wife out here now." He was angry and told Heather she needed to come back to the room. And when she told him she would "be right there," he said "we're leaving right now with or without you." She received a phone call and text messages from Jason where "[h]e was demanding, controlling and forceful and belligerent," so she told him she was going to stay "[u]ntil we calmed down . . . [a]nd talked about it again," as "[t]here was no reason for us to leave in the middle of the night." Jason left in the middle of the night with the twins and Jaleigh, causing Heather to have to borrow her sister's car to return to Nebraska. Heather also recalled them being at the Mall of America earlier that day so Jaleigh could shop with her Christmas money. Jason waited outside a store while Heather and Jaleigh went inside, and when Heather went to check on them, Jason "was mad and was telling me that I should have come out and checked on him sooner," and that it "didn't take two of us to pay for the clothes," and he called her names. After this trip, Jason told her he saw the family doctor and was put on medications.

In June 2010 (we note that Heather's August 2011 affidavit for a protection order indicated this incident occurred in June 2011), when Heather had a drill weekend in Lincoln, Jason insisted on coming and bringing the family. Heather had put Madisen into a time-out for throwing a temper tantrum, yet Jason gave Madisen candy. Heather took the candy away from Madisen; she and Jason argued and Jason started yelling. Heather had Jaleigh take the children out, "a lot of words were exchanged," and they ended up in the parking lot to go eat. They all got in the vehicle to go somewhere but decided to get out and walk to a nearby restaurant. Heather was crying, walking behind the vehicle, when Jason ripped the keys out of her hand and cut her wrist.

Also in the summer of 2010, Jason told Heather "that he wasn't even taking his meds and that he should just shoot himself. And he said, better yet, you do it. And he grabbed [Heather's] arm and tried to drag [her] towards the bedroom, where [she] knew the shotgun was underneath the bed in the bedroom."

In the late spring, early summer of 2011, Jason had a disagreement with Jaleigh over a prepaid debit card he had given her. Heather heard Jason say "something about being a bitch, to his daughter." Heather said Jaleigh was 15 at that time and that Jason "said it right to her."

In June 2011, the family was in Lincoln for Jaleigh's birthday when Jason threw food at Heather and tossed her out of their hotel room. (We note that Heather's August 2011 affidavit for a protection order indicated this incident took place when they were in Lincoln for Jason's brother's wedding reception.) Heather explained that she was putting Madisen in a high chair for breakfast, while Jason was putting Taylor in a high chair. Taylor slipped and banged his face on the table. Jason said something to Heather and she responded with something like "well, if you weren't on your phone, maybe that wouldn't have happened," and "it escalated from there." Jason "was name calling towards" Heather and "all of a sudden there was biscuits and gravy down the front of [Heather] . . . Jason threw it at [her]." Heather and Jaleigh went to the hotel room to pack up and Jason grabbed her "stuff" and scattered it "all over the floor outside of our room." When she went out to gather it up, Jason shoved her out the door and closed it behind her. Heather gathered up her things in the hallway and went downstairs to see if she could get a shuttle to the airport so she could get a rental car to go home. Heather went to their vehicle to get some of her personal belongings out and Jason grabbed her and dragged her out of the vehicle. When she walked back to the front of the hotel, Jason's father was there, "[a]nd for the first time, he actually grabbed [her] and gave [her] a hug." She got into the vehicle with Jason's parents and Jason came down to their vehicle and demanded the house keys; Heather was not allowed to go back home without him there - "[h]e didn't trust [her]." Heather rode with her in-laws from Lincoln back to Holdrege.

Heather also testified about the July 31, 2011, incident when Jason threw the pressed uniform across the kitchen, described in more detail previously. And her testimony about what happened at Aurora's Love gas station in February 2013 was consistent with Adams' testimony set forth previously.

Another incident took place on August 4, 2013. Heather was meeting Jason for his weekend with the children and she was kissing Madisen goodbye when an argument started between her and Jason about where they would be meeting. Jason refused to meet at the previously agreed upon date and time. The children became upset and Taylor would not get out of the car; Madisen was clinging to Heather. Heather tried to get Madisen down in Jason's truck, but she would not go. Jason was trying to get Taylor out of Heather's vehicle, but Taylor was screaming and crying. Heather asked Jason to let her calm Taylor down and to come back to Jason's truck, but he would not leave her vehicle. Jason told her to "get the hell away from [his] vehicle," so she started walking away and Jason "grabbed Madisen and ripped her out of [Heather's] arms, and her backpack fell to the ground." Jason placed Madisen in his vehicle and then returned to Heather's vehicle. Heather tried to close her door to calm Taylor down, but Jason placed himself between the door and roof and stood there. "[Jason] refused to leave. And so I finally convinced Taylor everything was going to be okay. That mommy and daddy are sorry for fighting in front of you. It's fine. We love you very much. You're going to have a great time. As I'm getting out of the car, Jason grabs him and throws him over his shoulder and walks to his truck." Following this exchange, Heather requested that exchanges occur at the police station in Aurora.

Heather said she had filed the request for a protection order and not for dissolution of marriage because she "wanted Jason to get some help." Heather described herself as "a caring, loving mother . . . committed to [her] children," and that "My children and God come first, and I

know that I can continue that environment for my children." Heather claimed she would provide the children a "violent-free home" and that Jason could not.

Heather had concerns about how Jason disciplined the children. She observed him pinch them on the back of the arm and back of the leg. The pinching would leave a "kind of red mark." He would spank them without first trying a time-out. Heather admitted that she had swatted on a diaper at least once. Heather's form of discipline typically started with redirection and talking, then she would use a 2- to 3-minute time-out if that did not work.

Heather described Jason's employment as "in and out of different jobs depending on circumstances." She said "[h]e did construction," then went "back to the farm and worked for the family," and then started construction again with a friend, then remodeled his parents' home, then remodeled his brother's home on the farm, "left the Air Force at one point to go do the farming," then "decided to come back in," and "shortly after his T.D.Y. for his training, he left the military again."

Regarding daycare, Heather testified that when she first got to Lincoln, she lined up a friend's daycare provider temporarily, and then they began at Little Munchkinland, a preschool. Heather took them out of Little Munchkinland for the 6 weeks the children would be with Jason in the summer; they would return on August 27. She changed the daycare (to Cedars) when she "moved to the new address" because it was closer to home.

Since January 2013, Heather lived in a 3-bedroom duplex in Lincoln with the children and her dog. The home had a fenced backyard and was in walking distance to the children's school, Arnold Elementary. The children had just begun kindergarten there (at the time of Heather's testimony in September 2013). Heather would drop the children off at school about 7:30 a.m. and pick them up shortly after she finished work at 4:30 p.m.

Heather testified that she and Dean Barrett are "very, very good friends," and they help each other with their children, and Heather's children and Barrett's children "are best friends."

Heather said her support group in Lincoln consisted of her church and the people there, Barrett, the "amazing people with the military," and her "wonderful neighbors all around" her. The children "do the parks and recreation before and after school program," are "trying out gymnastics," "have play dates with friends," have church on Sundays, and have counseling once a week with Heather. Heather said she started the counseling after the August 4, 2013, incident, "[b]ecause I know I have to change the way that I choose to react" to Jason, and "[f]or my kids' benefit, I can't be engaged." Heather said counseling is "teaching me that I need to have boundaries for me of how I'm not going to engage in an argument or disagreement. And I want to stay focused on my children's needs." Heather felt Jason provoked her into arguments at exchanges, that "[h]e's very manipulative, and he'll twist what you write into his own truth. He'll put words into your mouth that you never said." Heather expressed frustration in dealing with Jason regarding parenting matters, stating, "No matter what I do or try to say or try to meet the need or the request, it's never good enough." As an example, when Heather tried to talk to Jason about starting the children in kindergarten, he told her "no way," and "had they been born when they were supposed to, they wouldn't be starting kindergarten this year." He then hung up on her.

Heather explained that when she discussed a 50/50 split with Dr. Meidlinger, she meant that "if Jason could get a handle on his anger and abuse issues and seek help, an ideal situation

would be a 50/50 split so the kids could have both of their parents." However, Heather testified that joint legal custody would not be workable because the relationship "is not amicable," and Jason is "very unreasonable." She further stated, "I think that if Jason would get better, I think it could work. That's what I pray for."

### (vi) Jason's Rebuttal Evidence

On November 19, 2013, the fourth and final day of trial, Jason offered the September 18, 2013, deposition testimony of Linda Liljehorn as part of his rebuttal evidence. It was received without objection. Liljehorn is employed as a nurse at Family Medical Specialties in Holdrege. She testified that to the extent Dr. Meidlinger reported that she told him Jason's father was overbearing and that Jason's mother was passive, this was not true.

The testimony of another rebuttal witness, Dr. Cynthia Topf, was addressed above in the section discussing Dr. Meidlinger's report and testimony.

### (vii) District Court's Decision

The district court noted that it must make its own decision on custody and that "Dr. Meidlinger's opinion is only one factor in that determination," that "Dr. Meidlinger's main concern was about the father's obvious anger issues and his extended failures to support relationships with the mother," and that his "opinion is only a small part of the reason the Court is awarding custody to the mother." The court thereafter proceeded to engage in a detailed discussion of the custody factors it considered and which factors favored one parent or the other; these details have been set forth previously, including the district court's summary of why it was awarding physical custody to Heather.

### (viii) Legal Principles and Discussion

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923 (Cum. Supp. 2014), addresses requirements for the best interests of the child. It sets forth six factors, the first five of which include: a parenting plan which provides for a "child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress," § 43-2923(1); a parenting arrangement that "provides for the safety of a victim parent" when domestic intimate partner abuse is indicated, § 43-2923(2); that "the child's families and those serving in parenting roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between the children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child," § 43-2923(3); that "the court shall determine whether it is in the best interests of the child for parents to maintain continued communications with each other and to make joint decisions in performing parenting functions as are necessary for the care and healthy development of the child," § 43-2923(4); and a discussion of principles upon which "education of parents is delivered and upon which negotiation and mediation of parenting plans are conducted," § 43-2923(5). And § 43-2923(6) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

As we consider these factors relevant to the children's best interests and consider the evidence, we conclude there is favorable and unfavorable evidence for each parent in terms of being awarded custody of the children. And, when balancing the good and bad evidence between the two parties, we cannot say the district court abused its discretion in determining physical custody should be awarded to Heather.

Jason certainly produced evidence to support that he was a good father. In addition to Jason's many witnesses, as set forth in detail above, Dr. Meidlinger also testified that Jason was a very good father, that Jason was more at ease with the children than Heather, that Jason "did very well with the children," that Jason was good at leading and teaching them, and there was a positive and warm relationship between Jason and the children. There was evidence of a healthy relationship between the children and Jason's extended family, and Heather acknowledged she would be fine with Jason having the children for extended periods of time when she is deployed.

There is also evidence to support that Heather was a good mother. Even some of Jason's own witnesses agreed this was so. Norris acknowledged Heather had a loving, caring relationship with the children. Butler described Heather as "a good mom," and that she could not say anything bad about Heather. Reddish saw Jason and Heather "parent a lot together" and when asked if Heather was a caring and loving mother, she stated, "Yes. Yeah, I can't say that she wasn't." Dr. Meidlinger testified that Heather "loves her children," and "has organized her life around them."

And while there was favorable evidence for both Jason and Heather, there was also unfavorable evidence for each as well. Based upon the district court's conclusions, it would seem that it was the unfavorable evidence against Jason that tipped the scale against him being awarded physical custody, perhaps more than the favorable evidence for Heather tipped the scale her way. In deciding physical custody, it is clear that the district court was concerned about Jason's anger

issues, the evidence of which came from a variety of sources. Even ignoring the evidence regarding Jason's actions prior to the parties' marriage in 2008, and even setting aside any of Dr. Meidlinger's conclusions, there were many examples of Jason losing his temper and behaving inappropriately over somewhat minor matters, and several times this took place in the presence of the children.

One example is the incident that occurred the summer of 2011, not long before the parties separated. Jason threw food at Heather in front of the children and, also with the children nearby, threw her belongings out of the hotel room and shoved Heather out of the room. When Heather went to get personal belongings out of their vehicle, Jason grabbed her and dragged her out of the vehicle and demanded their house keys. Heather had to get into Jason's parents' vehicle, and even Jason's mother remembered having to give Heather a ride home. Another incident took place on February 3, 2013, at the Love's gas station in Aurora, where Jason was observed by a neutral party to throw something at Heather while she was holding Madisen. At an exchange on August 4, Jason and Heather argued, apparently upsetting the children such that Taylor was screaming and crying and did not want to get out of Heather's car and Heather was having difficulty getting Madisen, who was clinging to her, into Jason's truck. Jason told Heather to "get the hell away from my vehicle," and when Heather started walking away, Jason "grabbed Madisen and ripped her out of" Heather's arms and put her in his truck. And when Heather tried to calm Taylor down in her car, Jason grabbed him and threw him over his shoulder and walked away to his truck. These examples alone illustrate the concern the district court had with regard to awarding Jason physical custody, and we cannot disagree with its conclusion that Heather "is in better control of her emotions and will provide a better role model for the children in terms of controlling their emotions," and this "translates to better parenting." We cannot say such a conclusion is an abuse of discretion even when considering the unfavorable evidence against Heather, which we discuss next.

As Jason points out, there are questions with regard to Heather's credibility as relates to her misrepresentation of her income at the time of the temporary custody order in September 2011. There is certainly evidence that Heather was earning substantially more income than the $2,400 per month she reported at that time, and that she failed to disclose a $7,500 reenlistment bonus received at that time as well. At trial, Heather claimed that although she was on active duty orders for 30 days in August 2011 and another 30 days in September, she was not sure how long she would get to stay on active duty at that time; yet, she signed a housing rental application on August 12, 2011, listing $5,477.52 as her monthly income. Heather's lack of veracity regarding her income in September 2011 and her attempt to justify it later at trial is certainly evidence that weighs against her as a custodial parent when considering the importance of honesty and trustworthiness in raising children.

Jason also takes issue with Heather's character, noting that she would not agree "to even the simplest of requests," and "she will take whatever steps she can to minimize [Jason's] role in the children's lives." Brief for appellant at 55. Regarding "the simplest of requests," there is evidence to support Jason's assertion. For example, by the time Jason filed to reduce his temporary child support in April 2012, Heather's resistance to such a motion, when she was clearly aware that his child support had been miscalculated based upon her erroneous income information, demonstrates an unreasonable position. Jason was being ordered to pay $836 per month when he

should have been paying hundreds of dollars less. (This is discussed in detail later in the section on Jason's child support credit.) Rather than agreeing to modify child support when she knew the child support calculation was erroneous, Heather instead filed a motion to strike the request for failure to allege a material change in circumstances. Jason also had to file a motion to be permitted to claim one of the two children for tax purposes; again, it is understandable that Jason views Heather's resistance to such a reasonable request to be a sign of an unreasonable nature. While we agree that such actions can be viewed unfavorably, we are also mindful that some of these decisions may be influenced by the strategies of the parties' attorneys, and may not be solely attributable to a party.

As to Jason's assertion that Heather will take steps to minimize his role in the children's lives, we observe that although Heather engaged in some behaviors that might be construed this way, we do not see her actions as actively trying to minimize Jason's role as a parent to their children. For example, although Jason had to file a motion to clarify his temporary parenting time to mean alternating weekends rather than two weekends per month, the court did write "[t]wo weekends per month" in its temporary order. A parent supportive of the other parent's parenting time would be more likely to agree to such a correction since the standard noncustodial parenting time is routinely every other weekend. Forcing Jason to file a motion to get this corrected can be viewed as unreasonable, but does not rise to the level of Heather taking active steps to minimize his parenting role. There is also some problematic evidence about Heather's attitude towards Jason's parenting role revealed through Dr. Meduna's testimony. He confirmed that Heather failed to record Jason's name on the children's medical records and that Heather inquired about withholding information from Jason, which Dr. Meduna's office was not willing to do. This was a one-time incident in November 2011. Jason also testified that the materials from the children's daycare, Cedars, did not show him as the emergency contact for the children, and instead showed Heather's friend, Dean Barrett, and further, that the materials indicated that Jason could only have supervised access to visit the children. While it is certainly important to provide Jason's name and contact information in the daycare materials so that he can be notified of any emergency situation involving the children, it is not inappropriate to also list other persons who live in the same community who are more immediately available to attend to an emergency situation in a timely fashion when the custodial parent is unavailable. Although Jason's parenting time did not include any weekday parenting time that would have allowed him to see the children at the daycare during the week absent agreement with Heather, it is understandable that Jason would be upset about the daycare's materials indicating he could only have supervised access to his children. There is a negative connotation to that, and it would have been more appropriate for Heather to have indicated to the daycare simply that there were no weekday parenting time hours for the children's father and that the daycare should only release the children to him with advanced notice and consent from Heather. However, again, although not handled in the best of ways, this does not demonstrate that Heather was taking active steps to minimize Jason's role as a parent.

We also note that Dr. Meidlinger had concerns about Heather underestimating the impact of her smoking on the children's health problems.

Our review of the record reveals that the district court was correct in determining that both Jason and Heather are good parents. Looking at just their positive attributes, either parent could

certainly have been awarded physical custody. However, the record also reveals that both have deficiencies that weigh against them as the custodial parent. The district court focused on Jason's anger issues and this appeared to be the determining factor influencing the court's final decision on physical custody. The court was convinced that "there was at the very minimum emotional and mental abuse" by Jason against Heather. The court observed that both Heather and Jaleigh's mother were visibly upset when discussing Jason's treatment of them, and the court also noted there were various incidents where Jason's "anger issues escalated into bad situations." We cannot say it was an abuse of discretion to weigh this evidence more heavily than the concerns about Heather discussed above. Heather's deficiencies did not have a direct negative impact on the children, other than perhaps her smoking around the children. Jason's angry and unnecessarily aggressive behaviors in the presence of the children, however, did have a direct negative impact on the children as demonstrated by the children's reactions during the incidents described above. We conclude the district court did not abuse its discretion by awarding Heather physical custody of the children.

(d) Daycare Costs Owed by Jason

Jason's brief provides only one paragraph regarding his assigned error that the district court failed to determine the correct amount of daycare owed by him. He states that the evidence was clear that several amounts charged by Heather for daycare, as reflected on Exhibit 20, were for amounts accruing before there was an order requiring contribution from Jason; that the temporary order says Heather was to provide written proof to Jason of such charges by the first day of the month; and that our court "should examine the testimony of Jason Burkholder and the reasons payments were not made and independently decide the amount owed under the terms of the temporary order." Brief for appellant at 57. Jason points us to no specific evidence in the record to support these assertions.

Errors that are assigned but not argued will not be addressed by an appellate court. *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005). While this is the general rule, and while we decline to independently calculate daycare amounts as requested by Jason, we will nevertheless address what the record reveals on this matter.

From what we can tell, largely from reviewing the arguments made at the April 16, 2014, hearing on post-decree motions, Jason suggests (1) that his obligation on daycare costs should not have started until October 2011 rather than September 26, 2011 (date of temporary order), and (2) that he was not credited for some payments he made in November 2012.

As to his first argument, Jason testified on this daycare cost issue initially at a November 6, 2012, contempt hearing (for his alleged noncompliance in making daycare payments). At the November 6 hearing, Jason argued that he should not have to pay for daycare unless the children were actually in daycare. He argued that his one-half contribution did not have to start until October 2011, and Exhibit 20 shows daycare costs commencing September 26, 2011, which was the day the temporary order was filed. In the district court's February 19, 2013, order, it concluded Jason was not in contempt because Heather had not timely provided copies of daycare bills, but stated that Jason "cannot pick and choose to pay for daycare. The bill is the bill whether the children are there or not." The court ordered Jason to pay the balance due on Exhibit 20, $2,402.50,

but permitted him to pay it off in 24 installments. By its silence on the argument, the court was not persuaded, nor is this court on appeal, that Jason's daycare obligation commenced sometime later than the entry of the temporary order.

As to the November 2012 credits Jason suggests he did not receive, we note that at the hearing on both parties' post-decree motions, Heather's attorney stated that "Appendix 2 on Exhibit 141" showed credits for payments made by Jason, "So, the Court can review that and hopefully make a good determination as to that issue." This court has reviewed Exhibit 20 and Exhibit 141 and finds that the amounts owed by Jason through October 29, 2012, (the last entry noted on Exhibit 20) equals the $2,402.50 the district court ordered Jason to pay. Further, while Exhibit 20 shows a payment of $675 from Jason on October 19, 2012, we note that on Exhibit 141 this same payment is credited on November 15, 2012, instead of October 19. No other payments were made in October or November 2012. Therefore, the total payments made by Jason as reflected on either exhibit is the same through November 2012 and we cannot conclude that the court failed to credit Jason for payments made in November 2012.

Accordingly, we are unable to say that the district court abused its discretion in failing to grant Jason any relief with regard to its February 19, 2013, order setting forth the daycare costs owed by Jason to Heather.

(e) Jason's Earning Capacity Used in Child Support

In the February 21, 2014, decree, the district court stated that it "accepts [Heather's] proposed Child Support calculation showing [Jason] should pay $529.00 per month." The attached child support worksheet shows Jason's monthly gross income to be $3,200 ($38,400 per year), and after deductions for taxes and his child support obligation for Jaleigh ($444), Jason's monthly net income is $1,952.84 for purposes of calculating child support.

Jason argues that this income imputed to him is higher than what is reflected in his income tax returns. He contends that the tax returns for 2010, 2011, and 2012, reflect his actual income and that it was error for the court to use an earning capacity that included income he earned for a few months while working for his brother. In looking at the tax returns filed separately by Jason in 2011 and 2012, we note that his returns reflect the following total income: $10,150 (2011) and $8,931 (2012); other than $1,085 in wages reported in 2011, this income is attributable to Jason's construction business.

In response, Heather claims that Jason's earning capacity was based on his income prior to filing for divorce, as Jason was "receiving income from his family on a regular basis for the work he did on the family farm and that income suddenly disappeared after he filed for divorce." Brief for appellee at 33. Heather points out that Jason's bank statements (Exhibit 71) show that Jason received a 4-month average of $3,175 per month in income from March to June 2011. When questioned at trial about deposits to the bank account, Jason acknowledged receipt of checks from his brother for the following amounts: April/May 2011 ($3,500); April 7, 2011 ($3,000); June 1, 2011 ($3,300); June 9, 2011 ($3,200). Jason agreed that the following deposits were from his work with Burkholder Farms: March 10, 2011 ($800); March 18, 2011 ($800); March 25, 2011 ($800); April 8, 2011 ($800).

In general, child support payments should be set according to the Nebraska Child Support Guidelines. The guidelines provide that if applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources. Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned. *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015). Earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts. *Id.*

We first consider Jason's employment and earning history. At trial, Jason testified that he was self-employed in residential construction and remodeling; he started his own business in the winter of 2009. Prior to that, for over a year from May 2008 to August 2009, he worked for Steve Benjamin Construction, earning $17 per hour. From January to July 2010, Jason worked on a paid-per-job basis for Matt Benjamin Construction (Steve Benjamin's son), earning a total of $5,885 during that time. Jason stated that he left working with Steve Benjamin Construction because he and Matt Benjamin "left to go on our own."

Jason also helped at his family's farm located south of Holdrege "[a]s needed." He worked planting and harvest seasons, and "[s]ometimes a little in-between here and there." Jason's oldest brother, John Burkholder, Jr., ran the day-to-day farm operations. When asked if he received "any kind of stipend on a regular basis from Burkholder Farms," Jason responded that they provided him with a vehicle.

In considering Jason's work history and earning capacity, we note that prior to becoming self-employed, Jason was earning $17 per hour at Steve Benjamin Construction. A 40-hour work week would generate income of $35,360 per year. We also note that Jason acknowledged receiving four payments of $800 between March 10 and April 8, 2011, for his work at the family farm. Receiving $3,200 in the course of a month's work suggests more income is likely given Jason's own testimony that he works planting and harvest seasons, and "[s]ometimes a little in-between here and there." The 2009 tax return shows Jason earned $4,200 in farm labor income as reported on the attached Schedule C. None of the subsequent tax returns in the record show any separate reporting of farm labor income; however, as noted, Jason did not dispute the $3,200 earned from his work with Burkholder Farms from March 10 to April 8, 2011.

In Exhibit 59, Jason suggests that his child support should be based upon his total annual income, $10,150 (or $845.83 per month), as reflected in his 2011 tax return ($9,065 net profit from business plus $1,085 in wages = $10,150). Looking at Jason's 2011 and 2012 tax returns, we see that Jason's gross income for his construction business was $30,450 in 2011 (net profit after business expenses were deducted totaled $9,065 as indicated above) and $27,572 in 2012 (net profit after business expenses were deducted totaled $8,931). Among expenses listed on his Schedule C attachments, there are deductions of $13,845 (2011) and $10,074 (2012) for mileage expenses. Such expenses may include gasoline costs, but also include wear and tear on a vehicle. As previously noted, Jason drives a vehicle provided to him by Burkholder Farms, so it would have been reasonable for the district court to ignore part of these deductions in trying to approximate Jason's earnings through his construction business. But even doing that, we fall short

of the $38,400 income figure imputed to Jason. Therefore, relying on the tax returns alone, we cannot find support in the district court's acceptance of Heather's child support calculation.

However, as previously noted, earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources; further, using earning capacity to calculate child support is useful when it appears that the parent is capable of earning more income than is presently being earned so long as there is evidence that the parent can realize that capacity through reasonable efforts. See *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015).

The evidence supports that Jason can realize $38,400 in annual income through reasonable efforts. Jason was previously capable of earning $17 per hour (the equivalent of $35,360 per year) in the construction business for over a year when working for another construction company. He also had the ability to earn additional income helping out at the family farm. He earned $3,200 in the course of just one month's work for Burkholder Farms in 2011. Additionally, although we cannot tell whether the district court did or did not factor in additional in-kind income because of Jason being provided a vehicle by Burkholder Farms, the law permitted it to do so. It is well established that the provision of "in-kind" benefits, from an employer or other third party, may be included in a party's income for child support purposes. *Workman v. Workman*, 262 Neb. 373, 632 N.W.2d 286 (2001).

Whether the district court considered earning capacity in the same way we have here does not matter; based upon our de novo review of the record, we find that the evidence supports the district court's decision to impute an earning capacity of $38,400 per year to Jason. We cannot say the court abused its discretion in so concluding.

(f) Child Support Error in Temporary Order

With regard to Heather's representations about her income, Jason argues that "[t]here was obvious misinformation given to the court at the temporary hearing stage," and "[t]hrough the course of litigation, [Jason] sought numerous times to correct the error of the trial court in the amount of income earned by [Heather]." Brief for appellant at 58-59. Jason's position is that since Heather's income was not accurately reflected in the temporary child support calculations, he was ordered to pay more child support than he should have been. This is certainly true.

Regarding Heather's income, at time of parties' separation in August 2011, Heather had orders for August and September, and she learned in early October that she was awarded an active duty tour that went through September 30, 2012. She received a $7,500 reenlistment bonus "sometime in September" of 2011; it was for the second half of her 6-year commitment. Heather said she did not disclose the bonus income (when determining temporary child support) because "[i]t was a one-time payment." Heather said she used the bonus monies to obtain a residence and retain a lawyer for the divorce action.

After September 30, 2012, Heather did not get rehired for an active duty position, but was hired as a health services technician, "which is a G.S.8 civilian uniformed employee." She worked 40 hours per week at $20.58 per hour, and also received her drill pay of "470 and some change" per month, plus her disability pay of $499 per month. However, Heather anticipated going back on active duty beginning October 1, 2013, for another year, "as long as Congress agrees on a budget." Her base pay would be $4,300 per month, plus a basic housing allowance "around 13 or

"$1400 a month," and an additional $360 per month for V.A.S. (food allowance). Housing and food allowances are tax exempt. When Heather is not on active duty, she is paid a V.A. benefit for service-connected disability, in the amount of $499. She testified that when she was on active duty previously, she continued to be paid the disability pay, which means "eventually they're going to take that back from me. I'll have a debt to pay back."

In discussing Exhibit 47, a housing rental application she signed on August 12, 2011, Heather testified that it listed $5,477.52 as her monthly income. She explained that she "needed to represent what [she] had made over the last 30 days. . . so I tallied up all my L.E.S.s, and that was my take-home." She said her employment was only temporary at that point, and that she did not disclose her military bonus in her affidavit in September 2011 because "[i]t wasn't monthly income. It was a one-time payment." She claimed the active duty order "was offered to me at the beginning of October."

In the February 21, 2014, decree, the district court addressed the issue regarding the income imputed to Heather for temporary child support purposes. It found that Jason was ordered to pay temporary child support of $836 per month based on Heather having a gross monthly income of $2,400, but that her income was in fact "substantially higher than set out in her temporary affidavits." The court also referenced its May 10, 2012, order overruling Jason's request to recalculate child support at that time.

In the decree, the court found that Heather presently earned $4,300 per month on active duty, plus received a $1,300 to $1,400 monthly housing allowance. Accordingly, the court recognized that Jason's child support "had been set too high at least since May 12, 2012 [sic] when the Court overruled that last motion to reduce." The court accepted Heather's proposed child support calculation showing Jason should pay $529 per month. The court further concluded that Jason should receive a credit from June 1, 2012, through February 1, 2014, (a total of 21 months) for the difference of his temporary child support amount paid ($836/month) and what he should have been paying ($529/month). This equaled a credit of $307 per month for a total of 21 months, or $6,447. The court ordered child support of $529 per month effective March 1, 2014, less a credit of $200 per month, noting that "[t]he credit will be extinguished" in 32.24 months, at which time the child support "shall go back to $529" per month. The court stated, "The Court has never made this type of adjustment but equity in this case convinces the Court that since there was such a great disparity in what was Ordered and what should have been Ordered, a credit is merited."

Neither party argues the court erred in its decision to give a credit to Jason for his overpayment of child support, and such a decision has support in the law. See *Johnson v. Johnson*, 290 Neb. 838, 862 N.W.2d 740 (2015) (credit for overpayment of child support obligation permitted when equities of the circumstances demand it and when allowing a credit will not work a hardship on the minor children). Additionally, there is a general rule that absent equities to the contrary, modification of a child support order should be applied retroactively to the first day of the month following the filing date of the application for modification. *Pursley v. Pursley*, 261 Neb. 478, 623 N.W.2d 651 (2001). Here, however, we are dealing with a temporary order that incorporated a child support calculation based upon erroneous information, which the district court states in its decree resulted in a "great disparity" in what was ordered versus what should have been ordered.

Although Heather testified that she did not know about her active duty order until the beginning of October 2011, when questioned about a rental application she had signed on August 12, Heather testified that she had listed $5,477.52 as her monthly income. This income is consistent with Exhibit 45, a document showing Heather's military pay, and Heather acknowledged it showed her receiving a net income of $5,398.69 in August, $7,407 in September, $4,245 in October, $4,977 in November, and $7,742 in December. In contrast, Exhibit 113 was received, which was a letter dated September 19, sent on Heather's behalf addressing temporary custody matters and which reflected a monthly income of $2,399 ($537 drill pay, $475 VA disability, $1,387 earning capacity calculated at $8.00 per hour). It is clear that Heather's income exceeded the amount represented to the court, and that she continued to have substantial earnings thereafter.

The court gave Jason credit back to June 1, 2012; Jason argues that his credit should extend back to the date of the September 2011 temporary order (which made Jason's child support obligation effective commencing October 1, 2011). We agree. The only basis given by the district court for applying the credit back to June 1, 2012, rather than when the temporary order was entered, appears to be that May 10, 2012, was the date when the Court overruled Jason's "last" motion to reduce child support. The record reveals that Jason was making requests for adjustments to child support at least as early as January 2012 based upon Heather's income being higher than had been represented.

Given the income Heather actually had at the time of the temporary order, and given the court's own findings, we conclude Jason's credit should be applied retroactive to the commencement of the temporary child support obligation on October 1, 2011. This adds another 8 months of credit, for a total of 29 months during which Jason paid a higher amount of child support than he should have. His total child support credit should total $8,903 rather than $6,447, and the decree should be modified accordingly.

(g) Recusal of Trial Judge

Jason filed a motion on August 6, 2013, requesting that the district court judge recuse himself from the proceedings. In its September 5, 2013, order, the district court overruled the motion, stating, "The Court does not have a personal bias or prejudice concerning [Jason]. [Jason's] request is based on the fact he disagrees with the Court's ruling on an evidentiary issue. That is not a sufficient basis for recusal."

On appeal, Jason argues that the district court "used the wrong standard in determining whether recusal was proper, focusing inward on what the court itself indicated its personal feelings were and not instead looking outward to consider what a reasonable person may believe about the court's impartiality," and that the "court should have utilized the reasonable person standard and recused itself from further proceedings." Brief for appellant at 47-48. Jason claims that his motion "sets forth several actions and statements by the trial court that, when put together, certainly create the impression that the trial court may not be acting impartially." *Id*. at 48.

Jason's motion points out the following comments and actions as the basis for recusal: (1) at the December 4, 2012, hearing on Jason's *Schafersman* challenge to Dr. Meidlinger, the judge made comments, among others, about trusting Dr. Meidlinger "to make an evaluation and a recommendation," "he's one of the few whose opinion I trust," "who do I go to if I can't have

Meidlinger," recommendations on who should have custody is "an art" rather than science, and "if I rule this way, it's going to . . . totally change how we do domestic relations cases in this district . . . And one nice thing about Dr. Meidlinger, it cuts back on the number of cases we have to try because of the recommendation pretty much settling it"; (2) the court overruled Jason's challenge to Dr. Meidlinger's testimony; (3) on March 14, 2013, after Dr. Meidlinger's trial testimony, which Jason alleged was different from his report and deposition testimony, Jason sought to obtain Dr. Meidlinger's raw data [from the MMPI-II] to be examined by a clinical psychologist to assist in rebuttal testimony, and the court refused on the basis that the request came after the pretrial discovery deadline even though further proceedings were not scheduled for another 4 months out and the new/different testimony had come after the discovery deadline; and (4) over Jason's objection, the judge received Dr. Meidlinger's report.

When arguing his motion to recuse on September 5, 2013, Jason discussed the comments made by the trial judge at the hearing on his *Schafersman* challenge and also discussed the court's unwillingness to extend the discovery deadline to allow Jason to obtain the raw data from the MMPI-II used by Dr. Meidlinger in his custody evaluation. Noting that the court allowed the testimony of a witness (for Heather), who was added after the discovery deadline, Jason suggested that this "causes an inference that perhaps the Court is shielding Dr. Meidlinger from further inquiry." Jason suggested that the court's statements about its confidence in Dr. Meidlinger and that a successful *Schafersman* challenge would "put back domestic relations practice in this district for a long time," indicate an inference "that the Court is not acting entirely impartially."

On appeal, Jason argues that Neb. Ct. R. § 5-203, Canon 3, says that a judge shall perform the duties of judicial office impartially and diligently, and shall perform such duties without bias or prejudice. Jason contends that the actions and statements by the judge as set forth in his motion, "certainly create the impression that the trial court may not be acting impartially." Brief for appellant at 48. "Acting to protect Dr. Meidlinger from having to review his raw data after the doctor had changed his testimony at trial because a pretrial discovery deadline had passed even though the next hearing was over four months away clearly demonstrated that the court's impartiality was at risk." *Id.*

Heather responds that Jason waived his right to obtain the judge's disqualification because "he waited well beyond the earliest practice opportunity to file his [m]otion." Brief for appellee at 22. A party is said to have waived his or her right to obtain a judge's disqualification when the alleged basis for disqualification has been known to the party for some time, but the objection is raised well after the judge has participated in the proceedings. *Tierney v. Four H Land Co. Ltd. Partnership*, 281 Neb. 658, 798 N.W.2d 586 (2011). Heather argues that the items noted in Jason's motion to recuse show no bias or prejudice, and "he waited well beyond the earliest practic[able] opportunity to file his Motion to Recuse." Brief for appellee at 22. She points out that most of Jason's complaints arise from statements made by the judge at a hearing on December 4, 2012, and that Jason waited "until the passage of over nine months and two full days of trial before" filing the motion to recuse in August 2013. *Id.* As to other language complained about from the court's February 19, 2013, order, Jason waited "six months and two full days of trial" before filing the motion to recuse. *Id.* Heather points out the 2-to-5-months' gap from the occurrence of other complaints: receiving Dr. Meidlinger's report at trial on March 13, 2013, and denying Jason's

request to extend the discovery deadline on May 29, 2013. She argues that "[n]one of the statements or actions cited by Jason in his Motion to Recuse show any bias or prejudice under the reasonable person standard. Jason simply disagrees with [the judge] on evidentiary issues related to the Custody Evaluation of Dr. Meidlinger." Brief for appellee at 23.

A trial judge should recuse himself or herself when a litigant demonstrates that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice is shown. *Tierney v. Four H Land Co., supra*. A party is said to have waived his or her right to obtain a judge's disqualification when the alleged basis for the disqualification has been known to the party for some time, but the objection is raised well after the judge has participated in the proceedings. *Id*. The issue of disqualification is timely if submitted at the earliest practicable opportunity after the disqualifying facts are discovered. *Id*.

A motion requesting a judge to recuse himself on the ground of bias or prejudice is addressed to the discretion of the judge, and an order overruling such a motion will be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. *Huber v. Rohrig*, 280 Neb. 868, 791 N.W.2d 590 (2010). A party seeking to disqualify a judge bears the burden of overcoming a presumption of judicial impartiality. *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987).

In reviewing the specific statements or actions by the trial court which Jason claims reflect bias or prejudice, we see something different. The trial court engaged in an open discussion about the legal challenge raised with regard to Dr. Meidlinger's testimony; the consideration given by the trial court actually reflects favorably on the arguments made by Jason's counsel with regard to that testimony. It is evident that Jason's challenge to Dr. Meidlinger's methodology and application of the same caused the court to consider the historic practice of that district with regard to expert testimony in custody cases, apparently not previously challenged in such a manner. The fact that the trial court had substantial prior experience with Dr. Meidlinger and generally trusted him does not implicate bias, and in fact, the court indicated it did not always follow Dr. Meidlinger's recommendations.

Jason also argues that the court's action in overruling his challenge to Dr. Meidlinger's testimony and report, and overruling his request to obtain raw data from the MMPI-II following Dr. Meidlinger's trial testimony were indicative of the court's bias. Jason sought to obtain the raw data so he could have it examined by a clinical psychologist to assist in rebuttal testimony. The court refused on the basis that the request came after the pretrial discovery deadline. Jason seems to be arguing that the court's unwillingness to extend the discovery deadline is indicative of the court's bias because the new/different testimony had come after the discovery deadline and further proceedings were not scheduled for another 4 months out. However, decisions regarding discovery are directed to the discretion of the trial court. *Breci v. St. Paul Mercury Ins. Co.*, 288 Neb. 626, 849 N.W.2d 523 (2014). Also, the court's decision to allow Dr. Meidlinger's testimony and report was supported by the law, as previously discussed. Neither of these decisions by the district court reflect bias or that the court was other than impartial in its decisions.

Our review of the record establishes no bias or prejudice by the district court as a matter of law.

## 2. HEATHER'S CROSS-APPEAL

### (a) Failing to Award Heather Sole Legal Custody

Heather argues that "[t]he overwhelming evidence presented at trial was that joint legal custody was not in the minor children's best interests," and that sole legal custody should have been awarded to Heather. Brief for appellee at 39. She points out that she was awarded temporary legal custody, and that "joint legal custody would not be workable because [her] and Jason's relationship was not amicable and Jason was very unreasonable." *Id*. at 40. She acknowledged that she "expressed hope that if Jason could get better, joint legal custody could work," *id.*, but that during their separation for 2-1/2 years prior to trial, "Jason showed over and over that joint legal custody would not be workable." *Id.*

In support of her argument, Heather discusses the evidence showing difficulties in communications, such as Jason provoking her into arguments during visitation exchanges and recording those exchanges with "hidden listening devices and video recorders." Heather suggests that this "shows [Jason's] deep unfounded mistrust of [her]." Brief for appellee at 40. Heather also points out Jason's "inability to work on fundamental decision making for the children," as he "fought with her constantly" over daycare and daycare costs. *Id*. at 41. She also directs us to their disputes over health care decisions for the children, noting that Jason would take the children to medical providers without her knowledge or consent. And she says they were unable to agree on the children starting kindergarten; Heather felt the children were ready while Jason did not.

Heather also notes that Dr. Meidlinger testified that there was not sufficient communication between the parties to justify joint legal custody--that this would "lead to more stress than resolution of problems." She also claims the district court only "listed facts, analysis, and reasoning related to" the award of physical custody to Heather, and that "it failed to show any analysis or facts related to legal custody." Brief for appellee at 39.

Heather's examples and arguments challenging the court's decision to award joint legal custody are reasonable. However, as previously discussed, our standard of review limits our ability to reverse such decisions to only those situations where a court has abused its discretion. An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015). Once again, we cannot say that occurred here, because while Heather is correct that the evidence she relies upon disfavors joint legal custody, there is other evidence which would support it. And when there is both favorable and unfavorable evidence--even though the weight of the evidence leaning one way is greater than the other--short of the district court's decision being so unreasonable or so against conscience, reason, and evidence, we cannot say the court abused its discretion and must let its decision stand.

The district court's decree stated, "The Court has determined after a review of the parenting act, case law factors and facts of the case that it is in the best interests of the minor children to be placed in the permanent legal custody of both parties with primary physical custody placed with [Heather]." The Parenting Plan at paragraph 4 states:

> The responsibility for making minor decisions affecting the interests of the children at any particular time shall be reposed primarily in the person having their physical care at

that time. The parties shall consult with each other prior to making any major decisions (i.e., schooling, camps, religion, major medical issues, and the like) affecting the interest of the children and shall endeavor to harmonize any differences in their view.

Paragraph 5 of the Parenting Plan says that either parent is authorized to make emergency decisions affecting the health or safety of the children, and paragraph 6 states (emphases supplied):

On all matters of importance relating to the health, welfare, or education of the minor children, **the parties shall confer with a view toward a mutually acceptable determination of the issues**. By [way] of example, but not limited to the following:

(a) In the event of serious injury . . . the party first learning of the illness or injury shall notify the other as soon as practicable.

(b) The parties **shall consult with each other regarding the education and other major life decisions of the minor children**.

(c) Each of the parents shall have access to information relating to the children . . .

(d) Whichever parent enrolls the children in school or any other entity shall ensure both parents are listed as contacts . . .

(e) Each parent is authorized to consent to emergency medical care for the minor children at the times when the other parent is not reasonably accessible to give that consent.

(f) **Each parent shall continue to have a full and active role in providing a sound moral, social, economic, and educational environment for the children** . . .

(g) Neither parent shall plan or schedule discretionary activities or non-emergency medical appointments during the time the minor children are to be with the other parent, without reasonable notice and consent in advance from the parent with whom the children are or will be residing at the relevant time. Consent shall not be unreasonably withheld. Once the activities are agreed upon, each parent shall use his or her best efforts to ensure the children['s] attendance at the activities and/or medical appointments.

(h) Neither parent shall do any act that will estrange the children for the other parent or perform any act that will hamper the natural development of love and affection that the children have for each parent.

(i) **Both parties share the responsibility for the care of the minor children, and allow each to fully participate in all major decisions affecting the health, education and welfare of said children.** The provisions of this plan regarding scheduling the time of the minor children to be spent with each parents [sic] and other forms of responsibility between parents are intended to establish the minimal pattern necessary to create a comfortable routine and to avoid conflict between [Jason] and [Heather].

(j) Each parent shall have the primary responsibility for meeting the basic needs to the minor children during the time that said children are with that parent. . . need to develop and maintain consistent standards with respect to diet, behavior and discipline, moral guidance, secular and religious education, personal hygiene and grooming . . . **[Jason] and [Heather] shall make all reasonable efforts to negotiate any inconsistencies that may arise between them in any manner concerning the children['s] welfare.**

(k) **Each parent shall be entitled to actively participate** in the scholastic endeavors, school conferences . . .

(l) Each parent shall exert his or her best effort to maintain free access and unhampered contact between the minor children and the other parent, and to foster a feeling of affection between the children and the other parent. Neither parent shall do anything which would estrange the children from the other; would hinder the opinion of the children with respect to the other . . .

(m) Should [Heather] be deployed while in the military service she shall contact [Jason] to make arrangements for the children to be in [Jason's] care and custody during said deployment.

We set forth these details of the district court's Parenting Plan to reveal the depth of the court's consideration of these issues pertinent to legal custody; we have bolded certain provisions to draw attention to the court's goal of keeping both parents actively engaged with their children by granting them mutual authority and responsibility.

The Parenting Act defines "joint legal custody" as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Cum. Supp. 2014). As we stated in *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 516-17, 873 N.W.2d 208, 218 (2016):

We acknowledge that courts typically do not award joint legal custody when the parties are unable to communicate effectively. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009) (joint decisionmaking by parents not in child's best interests when parents are unable to communicate face-to-face and there is a level of distrust); *Klimek v. Klimek*, 18 Neb. App. 82, 775 N.W.2d 444 (2009) (no abuse of discretion by district court's failure to award joint custody when minor child was confused by temporary joint legal and physical custody arrangement and parents had hard time communicating with one another). However, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. Neb. Rev. Stat. § 42-364(3) (Cum. Supp. 2014) states: Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent. . . .

However,

appellate courts review custody decisions for an abuse of discretion, and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). See, also, *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014). In affording such

deference to the trial courts, appellate courts have in some instances declined to reverse trial court decisions where joint custody has been awarded or maintained even when the evidence demonstrates a lack of communication or cooperation between parents.

*State on behalf of Maddox S.*, 23 Neb. App. at 518, 873 N.W.2d at 219.

In *State on behalf of Maddox S.*, *supra*, we went on to discuss *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015) (despite parties inability to communicate, joint legal custody decision left intact) and *Kay v. Ludwig*, 12 Neb. App. 868, 686 N.W.2d 619 (2004) (joint legal custody affirmed even though mother alleged nonexistent communication, confrontations, and harassing behavior by father). In *State on behalf of Maddox S., supra*, we affirmed the joint legal custody decision because we gave deference to the district court's attempt to find a workable solution to best protect the minor child's best interests. Because of the power struggle between the parties in that case, the district court was not willing to favor one parent over the other in allocating parental responsibilities or parenting time.

In the present case, the evidence likewise supports not favoring one parent over the other in allocating parental responsibilities. There were instances of disagreements, hot tempers, and inappropriate behaviors between the parties. Both parties contributed to such problems in a variety of ways. However, the evidence also shows that Jason and Heather love their children and that the children had good relationships with both of them. Further, much of the distrust, disagreement, and testy moments between the parties stemmed primarily from the lengthy, ongoing divorce litigation, with each parent trying to capitalize on any questionable or negative behavior by the other parent. Sadly, this is often the case in such proceedings. That the district court saw beyond that and chose to give these parents an opportunity post-divorce to work together for the best interests of their children is not an abuse of discretion, but an endorsement of the more positive parenting traits possessed by both of these parents. Encouraging parents to move past the power struggles intrinsic to custody disputes when the litigation is over by keeping both parents involved in making important decisions and making both parents share responsibilities in the manner set forth in the Parenting Plan in this case promotes a healthy co-parenting relationship. When the evidence shows that both parents are fit, responsible and loving parents, then keeping both parents actively involved in their children's lives will always be in the children's best interests. The district court's decision in this regard was not an abuse of discretion.

### (b) Awarding Jason 8 Consecutive Weeks of Parenting Time and Failing to Address Children's Birthday

Heather argues that it is not in the children's best interests for Jason to have 8 consecutive weeks of summer parenting time with them. In support of this, she claims that

> [t]here is a risk and grave concern that the behavior exhibited by Jason during the parties' marriage and during visitation exchanges will be copied by the children if he has such extended parenting time. Jason's failure to acknowledge his bad behavior or the bad behavior he exhibited in the presence of the children is a major concern if he were to have such extensive parenting time each summer.

Brief for appellee at 44. Heather acknowledges that she testified that "in a healthy, amicable parenting relationship that it was in the best interest of any child to have a 50/50 parenting plan." Brief for appellee at 44-45. But this would not be possible "until Jason got a handle on his anger and abuse issues and sought help." Brief for appellee at 45. Heather claims that extended summer parenting time "with a parent who is so unstable" is not in the children's best interests. *Id*. Further, she argues that the 8 weeks of summer parenting time "denies the minor children ever having a birthday with their mother unless their birthday falls on a weekend," *id.*, (the twins' birthday is in July), and does not leave Heather an opportunity to go on summer vacations with the children, and "will likely prevent the children from participating in summer camp and sports with their friends and classmates over the summer months." *Id*. Heather suggests the "children's interests would be better served if Jason's summer parenting time was for the months of June and July; not to exceed six weeks cumulative time." *Id*.

Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Rommers v. Rommers*, 22 Neb. App. 606, 858 N.W.2d 607 (2014).

Our de novo review of the record reveals evidence of the children having healthy relationships with their father and their extended family in Holdrege. Dr. Meidlinger testified that Jason "did very well with the children," and that he was good at leading and teaching them, and there was a positive and warm relationship between Jason and the children. Multiple witnesses testified collectively that Jason does "a good job" taking care of the twins, he is a "loving and caring parent," he is "kind and patient" with the children, the children are "very affectionate with him" and "seem perfectly happy." Further, the children have spent considerable time with extended family in Holdrege and should have opportunities to maintain those relationships. As noted by their grandfather, they loved going "out to the farm," and the children and their grandfather were "attached to each other." Their grandmother testified that "[f]amily is very important," and "it's very common for us to get together a lot." Jason's parents took care of the children whenever Jason and Heather were gone for weekend Guard duty, which was one weekend per month and two weeks each year, and whenever else they were needed. The fact that the children will spend 8 consecutive weeks with Jason rather than the 6 cumulative weeks that Heather would prefer does not rise to the level of an abuse of discretion by the district court. Heather will be entitled to the same alternating weekend parenting time during the summer that Jason exercises during the school year. When a custodial parent relocates far enough away to adversely impact the other parent's ability to more regularly spend time with the children or participate in the children's school year activities, it is entirely reasonable for a district court to award a larger block of summer parenting time to that other parent.

Heather argues that this leaves her "little to no time" to take summer vacations with the children, but she does not direct us to any evidence in the record which would support that the children's summer school vacation time is only 8 weeks' long. Although her options for scheduling summer vacation plans will be limited to the summer vacation weeks preceding or following Jason's 8 consecutive weeks, we cannot say it was an abuse of discretion for the district court to award this block of summer parenting time to Jason.

As for Heather's complaint that the summer schedule precludes her from having an opportunity to spend time with the children on their birthday in July, this does appear to be an oversight in the parenting plan. While, as she acknowledges, the children's birthday may from time to time fall on one of her summer alternating weekends, we agree that the parenting plan should provide specifically for birthday parenting time to the extent the parties cannot otherwise agree. Therefore, we modify the parenting plan to permit the parent not otherwise scheduled to have the children on the evening of their birthday to be permitted 4 hours of parenting time from 11:00 a.m. to 3:00 p.m. on the day of the children's birthday, unless other times are agreed upon by the parties. This birthday parenting time shall take place in the city the children are otherwise scheduled to be the evening of their birthday, unless otherwise agreed upon by the parties.

(c) Failing to Prorate Cost of Health Insurance
Between Parties in Calculating Child Support

Heather claims she was paying $177 per month for health insurance for the parties and their children, and she should have received credit for $142 of that for the health insurance costs related to the children when calculating child support. She says the district court correctly included this amount when calculating temporary child support, but failed to include this cost in its final calculations.

We first observe that, as Heather says, the district court's September 26, 2011, temporary order does attribute $142 to Heather for health insurance premium costs in the attached child support calculation. In the February 21, 2014, decree, the court "accepts [Heather's] proposed Child Support calculation showing [Jason] should pay $529.00 per month." The calculation relied upon by the court and attached to the decree, attributes $5,960 in taxable income to Heather and $3,200 in taxable income to Jason. Heather is correct that there is no health insurance premium cost attributed to either party.

However, we recall that Heather testified that she has no health insurance costs for herself and the children when she is on active duty. It is only when she is not on active duty that she pays for health insurance. She testified that she started paying a health insurance premium when her active duty order ended; she stated "it would have been October of 2012 I started paying an insurance premium again," and from October 17, 2011, until September 30, 2012, "I did not." That means she received the benefit of a health insurance premium credit of $142 per month in the temporary child support order (entered September 26, 2011) during periods of time (October 2011 to September 2012 and October 2013 to February 2014) when she was on active duty and did not have to pay for health insurance. Heather only had to pay health insurance premium costs when she was not on active duty, which she testified was her status from October 2012 to September 2013 when she was "a G.S.8 civilian uniformed employee." We calculate that this health insurance credit attributed to Heather at the time of the temporary order increased Jason's temporary child support from $760 to $836 per month. However, since Jason is receiving a credit for his overpayment of temporary child support, this erroneous health insurance credit to Heather for those active duty periods under the temporary order is harmless since Jason is being credited for everything paid in excess of what the district court determined he should have been paying.

With regard to the failure to credit Heather for health insurance premium costs in the child support calculation adopted in the final decree, Heather testified she would be on active duty again beginning October 1, 2013. Therefore, at the time the district court entered the decree of dissolution in February 2014, Heather was again on active duty with no health insurance premiums to pay. Accordingly, we conclude the district court did not abuse its discretion by excluding health insurance premium costs in the child support calculation adopted by the court in its final decree.

(d) Failing to Take Into Account Changes in Heather's Income From
October 2012 to September 2013 When Awarding Jason Child Support Credit

As discussed earlier, because Heather's income was not accurately represented when Jason was ordered to pay temporary child support of $836 per month effective October 1, 2011, the district court gave Jason a child support credit to account for his overpayments of child support. The district court applied a $307 per month credit from June 1, 2012, through February 1, 2014, (21 months) for a total child support credit of $6,447. As also discussed previously, we concluded this credit should have been applied retroactively to the commencement of the temporary child support on October 1, 2011, which added another 8 months of credit. This resulted in 29 months' credit or a total child support credit of $8,903 for Jason. Heather argues that Jason should receive that $307 per month credit for only 9 months, resulting in a total child support credit of $2,763.

Heather argues that only 9 months of credit are due because the district court failed to take into account fluctuations in Heather's income from September 2011 to February 2014. As discussed above, Heather's job changed from active duty (August 2011 to September 2012) to non-active duty (October 2012 to September 2013) and back to active duty (October 2013 to decree) during the course of the underlying proceedings. Her pay during active duty is higher than when she is not on active duty. The income attributed to Heather in the final decree, while on active duty, was $5,960 per month. This included $4,300 for her base pay, $1,300 for her housing allowance, and $360 for her food allowance, the latter two allowances being tax exempt.

Heather argues that from October 2012 to September 2013, she made $1,646 every 2 weeks (except for 6 weeks in July and August 2013 when she was furloughed and earned a lesser base pay of $1,295.51 every 2 weeks), plus VA compensation of $490 per month and drill pay of $570.80 per month. Not considering the furloughed period, this amounts to $4,627 per month. Heather appears to be arguing that simply because Heather had less income during these 12 months, Jason should not get any child support credit for any of these months. However, Heather fails to provide any child support calculations to show what difference Heather's reduced income would have made in the resulting child support over the course of those 12 non-active duty months. The $4,627 per month Heather claims she earned during those 12 months is still considerably higher than the $2,400 per month she represented as her income at the time the temporary child support order was entered. There would still be a credit due to Jason for those months, perhaps something less than the $307 determined by the district court, but we are not persuaded that Jason should get zero credit for those months.

Additionally, we recall that Exhibit 45 showed Heather's military pay, and Heather acknowledged it showed her receiving a "net" income of $5,398.69 in August 2011, $7,407 in September 2011, $4,245 in October 2011, $4,977 in November 2011, and $7,742 in December

2011. The monthly net income being attributed to her under the 2014 decree is $4,585. It is clear that Heather's income fluctuated quite favorably for her during periods under the temporary order, and we are also mindful that the $7,500 bonus she received in 2011 was never included as part of her income under the temporary order. We cannot say the district court abused its discretion in failing to account for fluctuations in Heather's income for her 12 months of non-active duty work when determining Jason's credit for his overpayment of child support under the temporary order.

## VI. CONCLUSION

We affirm the district court's February 21, 2014, decree of dissolution as amended by the court's June 23 order, but modify as follows: (1) Jason's child support credit should be extended from 21 to 29 months, resulting in a total child support credit of $8,903 rather than $6,447; and (2) the parenting plan should be modified to provide for parenting time on the children's birthday as set forth herein. The decree should be modified accordingly.

AFFIRMED AS MODIFIED.